John Domino, Individually and as Guardian ad Litem of Joseph Domino, an Infant, Respondent, v. Philip S. Mercurio et al., Appellants.

Fourth Department, December 6, 1962.

*John P. Egan* and *Elmer S. Stengel* for appellants.

*Montesano, Garvey & Magner* (*Philip H. Magner* and *Charles D. Brown* of counsel), for respondent.

HALPERN, J. This action was brought to recover for injuries suffered by the infant plaintiff when he fell over a bench while playing in a softball game in a school playground maintained by the Board of Education of the City of Buffalo, on August 23, 1956.

The playground was screened in by a fence. The third base line was 27 feet from the nearest fence. There were three benches in the baseball area; one was on the first base side, and two were on the third base side, up against the fence. It was contemplated that the players would use the benches while they were awaiting their turn at bat. The game in which the plaintiff was injured was a championship contest. A crowd of approximately 125 persons watched the game, about 100 of them being on the third base side of the diamond. Attendance by spectators, especially by parents of the players, was encouraged at the ball games. The crowd appropriated the benches and overflowed onto the ground in front of them.

The infant plaintiff was the catcher on his team. A foul ball was hit into the crowd between home plate and third base. The plaintiff ran after the ball " as fast as [he] could ", looking up at the ball as he pursued it. He tripped over a spectator, who was apparently sitting on a bench, and he fell over the bench and as a result broke his leg. The evidence justified a finding that the bench was then halfway between the fence and the third base foul line.

The Board of Education approved the organization of the softball league and provided the equipment for the games and assigned teachers as supervisors. The defendants Mercurio and Walter were assigned to supervise the game involved in this case. Walter acted as umpire and was charged with the duty of controlling the ground on the third base side of the field; Mercurio supervised the crowd on the first base side.

Ropes and standards were available which could have been used to restrain the crowd if the supervisor thought it necessary or wise. The defendant Walter did not consider the use of ropes necessary to control the crowd on the day in question. It was Walter's practice to halt the game and to compel the spectators to move back to the fence if they moved so near the foul line as to endanger the players. This he did on two occasions during the game, but the spectators " gradually drifted " forward again. This time they were not ordered back and, while the spectators were close to the third base line, the accident occurred.

At the conclusion of the case, no motion to dismiss the complaint was made by the defendants. This constituted a con-

cession by the defendants that there was a question of fact to go to the jury (*Murtha* v. *Ridley,* 232 N. Y. 488, 491–492). The jury returned a verdict in favor of the plaintiffs against all the defendants.

We have no difficulty in affirming the judgment against the individual defendants. There was ample evidence to support the finding implicit in the jury's verdict that the supervisors had been negligent in allowing the spectators to congregate close to the third base line, to push the bench into a dangerous position and to obscure it from the view of any baseball player who might run after a foul ball near the third base line. There is no question in this case as to the sufficiency of the notice to the defendants Walter and Mercurio. They were present at all times and the recurring gradual movements of the spectators toward the third base line were visible to them.

The findings implicit in the jury's verdict that the plaintiff was not guilty of contributory negligence and that he was not chargeable with a voluntary assumption of a known risk in connection with his injury are also in accordance with the weight of the evidence.

The difficult problem in the case is presented by the question of the liability of the defendant Board of Education. The trial court charged the jury: " Now, in maintaining playgrounds, the City or any of its agencies, and that includes the Board of Education * * * acts as a legal individual and is not immune from liability for the negligence of its officers given charge and authority over such playgrounds and the apparatus there contained ".

The appellant Board of Education argues vigorously upon appeal that this charge was erroneous since it authorized the jury to find the board liable under the ordinary principle of *respondeat superior* and made it liable for the negligence of its teachers or playground supervisors, without any finding that the board itself had been guilty of negligence in the selection of the teachers or supervisors.

No exception was taken to the court's charge and, as has been noted, no motion to dismiss was made at the close of the case. But we have the power to reverse in the interests of justice, if the case was submitted on a fundamentally erroneous theory, even though no exception was taken (*Niagara Mohawk Power Corp.* v. *Ætna Ins. Co.,* 15 A D 2d 390, 394). The question of whether the charge was correct is therefore before us for decision.

We have come to the conclusion that the charge was correct and that the board was properly held liable in this case. In our

opinion, the charge represents the present law, although no appellate court has as yet spelled out the liability of Boards of Education in as broad terms as those used by the trial court in this case. In order to reach this conclusion, we found it necessary to review the historical development of the liability of school districts and Boards of Education, in the context of the step-by-step abolition of governmental immunity in this State.

For more than three quarters of a century Boards of Education have been held liable for their own negligence (*Bassett* v. *Fish*, 75 N. Y. 303, 310–312; *Herman* v. *Board of Educ.*, 234 N. Y. 196). This liability was well recognized, even during the period when the doctrine of governmental immunity prevailed generally as to the State and its civil divisions. The special liability of Boards of Education was placed upon the ground that, while the Board of Education was a governmental agency, it was not a civil division of the State but a body corporate and that therefore it was answerable for its torts " to the extent of the funds vested in it * * * by statute or which it is empowered thereby to raise by local taxation " (*Herman* v. *Board of Educ.*, *supra*, p. 202; *Lessin* v. *Board of Educ.*, 247 N. Y. 503, 510). The liability also was said to rest upon the theory that specific statutory obligations had been imposed upon the Boards of Education and school districts and that they could properly be held liable for the breach of their statutory obligations (*Wahrman* v. *Board of Educ.*, 187 N. Y. 331, 334–335; *Lessin* v. *Board of Educ, supra*, p. 511).

The liability thus recognized extended to the maintenance of school premises and facilities in a state of good repair and also extended to the administrative acts of the board. Thus Boards of Education were held liable for injuries due to the defective or dangerous condition of the school premises, or to their failure to promulgate suitable rules and regulations where necessary or to their failure to exercise reasonable care in the selection of competent teachers and supervisors of student activities (*Lessin* v. *Board of Educ.*, *supra*, p. 510). However, it was well settled that a Board of Education was not liable for the negligence of the teachers in the performance of their duties, if the teachers had been selected carefully and appropriate rules for their conduct has been established (*Lessin* v. *Board of Educ.*, *supra*, p. 510; *Graff* v. *Board of Educ.*, 258 App. Div. 813, affd. 283 N. Y. 574; *Miller* v. *Board of Educ.*, 291 N. Y. 25). This limitation upon the liability of Boards of Education was based primarily upon the idea that the board had discharged its statutory obligations and that as a governmental agency it was immune from any further liability. Sometimes, the limita-

tion of liability was placed upon the ground that teachers were not ordinary employees and that the doctrine of *respondeat superior* did not apply to them (*Lessin* v. *Board of Educ., supra*). Sometimes, there was a merger of the two ideas and it was said that the doctrine of *respondeat superior* did not apply because of the governmental immunity of the board after it had discharged its statutory obligations (*Herman* v. *Board of Educ.,* 234 N. Y. 196, *supra*). " Such agents, like policemen in a city, are personally liable for their torts \* \* \* but the corporation is not chargeable with their defaults " (*Herman* v. *Board of Educ., supra,* p. 201).

During this period, it was held that the State was not liable for the negligence of teachers and supervisors employed in schools operated directly by the State, because the State came under the umbrella of general governmental immunity. When, however, in 1929, section 12-a (now § 8) of the Court of Claims Act was adopted and the State's immunity was abolished, the State became liable for the torts of its agents and employees to the same extent that a private person engaged in the same enterprise would be liable. Under this statute, the State became liable for the negligence of teachers in schools operated by the State (*Rook* v. *State of New York,* 254 App. Div. 67). The impact of the change was well stated by Justice HEFFERNAN in the *Rook* case (p. 70): " The Attorney-General takes the position that the State is not liable because, as he claims, competent teachers and supervisors were employed. The question before us is not whether the State was negligent in selecting incompetent or unfit employees or servants to perform the services for which they were employed. We are dealing here with the doctrine of *respondeat superior.* Section 12-a of the Court of Claims Act expressly provides that the State ' waives its immunity from liability for the torts of its officers and employees,' and expressly ' assumed liability for such act ' ". (See, also, *Bloom* v. *Jewish Bd. of Guardians,* 286 N. Y. 349.)

The liability of the State for the negligence of its teachers has been recognized in numerous cases in the Court of Claims and in the appellate courts (see, e.g., *Holleran* v. *State of New York,* 8 A D 2d 997; *Gardner* v. *State of New York,* 256 App. Div. 385, affd. 281 N. Y. 212).

Subsequently, in two decisions by the Court of Appeals in 1943 and 1945, the abolition of the State's immunity was held to have withdrawn the support upon which the immunity of municipalities and political subdivisions of the State had rested. It was accordingly held that cities and counties and all other

civil divisions of the State had become liable for the negligence of all their employees (*Holmes* v. *County of Erie*, 291 N. Y. 798, affg. 266 App. Div. 220 [1943]; *Bernardine* v. *City of New York*, 294 N. Y. 361 [1945]). As the court explained in the *Bernardine* case, the doctrine of *respondeat superior* had been held inapplicable to cities in the past upon the ground that the " officers and employees thereof — when engaged in the discharge of so-called governmental functions — acted as delegates of the State and not in behalf of any municipal master ". But that " argumentation  *  *  *  had been contrived as a front for the doctrine of governmental immunity " and it " did not survive the renouncement of that doctrine " (p. 366).

It would seem that the same line of reasoning should have been applied to teachers and supervisors employed by Boards of Education and that Boards of Education thenceforth should have been held liable for the negligence of all their employees. In view of the general abolition of government immunity, by the combined action of the Legislature and the courts, it would seem that there was no longer any need to invoke a special rule of liability with respect to Boards of Education and, correspondingly, the limitations upon the rule of liability were no longer operative (2B Warren, Negligence, 163–164; Note, 12 Brooklyn L. R. 64, 65–66). It had been held that the abolition of the State's immunity had abolished the immunity of all civil divisions of the State. A fortiori, this would seem to have abolished any ground for immunity of governmental agencies of an inferior category, like Boards of Education, which did not rise to the status of civil divisions of the State. However, the courts did not take this sweeping and clear-cut approach to the problem. Even after the Court of Appeals had held in 1945 that the liability of municipalities and other civil divisions of the State was no longer subject to limitations or exceptions with respect to any particular class of employees, the trial courts and the Appellate Divisions continued to reiterate the old rule that Boards of Education were not liable for the negligence of the teachers employed by them, unless they were negligent in selecting and employing them. (See, e.g., *Ferrill* v. *Board of Educ.*, 6 A D 2d 690; *Germond* v. *Board of Educ.*, 10 A D 2d 139.)

Only one case in which the point here made could have been raised reached the Court of Appeals after 1945. The case was that of *Luce* v. *Board of Educ.* (2 A D 2d 502, affd. 3 N Y 2d 792). The plaintiffs' attorney in that case did not raise any question as to the effect of the *Bernardine* case; on the contrary, he conceded that the old rule of the nonliability of the Board of

Education for the negligence of its teachers was still in force but he tried to bring his case within the rule that the board was liable for failure to promulgate necessary regulations. In the opinion in the *Luce* case in the Appellate Division, the court noted that " The plaintiffs concede " that the " defendant Board of Education, once having engaged competent teachers, is not responsible for their negligence " and " do not claim liability under the doctrine of *respondeat superior* " (p. 505). The same position was taken by the plaintiffs' counsel in the Court of Appeals. The court was therefore not called upon in the *Luce* case to decide whether, in the light of the general abolition of governmental immunity, the old rule as to Boards of Education could stand any longer.

The paucity of cases on the question of the liability of Boards of Education in the Court of Appeals after 1945 may partly be explained by the fact that as to New York City it had been provided by statute since 1937 that the Board of Education of the City of New York was liable for the negligence of its teachers (Education Law, § 881-a, as added by L. 1937, ch. 884, now Education Law, § 2560; see *Reeder* v. *Board of Educ. of City of N. Y.,* 265 App. Div. 158, affd. 290 N. Y. 829; *Ohman* v. *Board of Educ. of City of N. Y.,* 300 N. Y. 306). A statute, similar in nature but worded a little differently, had been adopted as to up-State New York as well in 1937 (Education Law, § 569-a, as added by L. 1937, ch. 887, now Education Law, § 3023) but this statute was construed as only providing indemnity for the teachers and not authorizing a direct action by the injured person against the board (*Massimilian* v. *Board of Educ.,* 261 App. Div. 428 [4th Dept.]; but, see, *Ohman* v. *Board of Educ. of City of N. Y., supra,* pp. 309–310; *Sandak* v. *Tuxedo Union School Dist.,* 308 N. Y. 226, 231).

It is of interest to note that in another line of cases, there had been a similar failure for several years to recognize the impact of the general abolition of governmental immunity. Cities had been made liable for the negligence of doctors rendering services in city-operated hospitals by statute in 1937 (General Municipal Law, § 50-d, as added by L. 1937, ch. 483). But the statute was construed as applying only to doctors rendering services gratuitously and not to the doctors regularly employed by the city for compensation (*Schmid* v. *Werner,* 277 App. Div. 520, affd. 303 N. Y. 754). Curiously, this case was decided in 1950, long after the *Bernardine* case, but the plaintiff's attorney relied solely upon the statute and made no claim that the general abolition of the city's immunity affected the case. When the

point was raised in another case several years later, the Court of Appeals held that the doctrine of *respondeat superior* was fully applicable to city-operated hospitals and that the city was liable for the negligence of physicians employed and paid by it, without regard to the limitations of section 50-d of the General Municipal Law. The court pointed out that the State had been held liable for the negligence of doctors employed by it in State hospitals (*Liubowsky* v. *State of New York,* 260 App. Div. 416, affd. 285 N. Y. 701; *Robison* v. *State of New York,* 292 N. Y. 631) and it held that the principle of *respondeat superior* was equally applicable to city hospitals (*Becker* v. *City of New York,* 2 N Y 2d 226, 233–235). As to the *Schmid* case (*supra*) in which the point had been overlooked by the plaintiff's attorney, the court merely said: " the question before us was not raised below, and only the applicability of section 50-d of the General Municipal Law was considered " (p. 235).

While these developments were going on in the field of governmental immunity, the immunity of charitable corporations was undergoing a similar evolution. After section 12-a of the Court of Claims Act, abolishing the State's immunity, was adopted, the Court of Appeals held that, in the light of that statute, charitable immunity ought to be abolished too. The court accordingly declared that a charitable institution was liable for the negligence of its servants, not only to the general public but also to its own patients (*Sheehan* v. *North Country Community Hosp.,* 273 N. Y. 163, 166). However, a vestige of the old immunity doctrine, laid down in the older cases, survived with respect to the negligence of professional employees, such as doctors and nurses in charitable hospitals and professors and teachers in universities (*Schloendorff* v. *Society of N. Y. Hosp.,* 211 N. Y. 125; *Hamburger* v. *Cornell Univ.,* 240 N. Y. 328). This was analogous to the survival, in the Appellate Division decisions, of the immunity of Boards of Education from liability for the negligence of their teachers.

In 1957, the Court of Appeals abolished the last remaining vestige of charitable immunity in *Bing* v. *Thunig* (2 N Y 2d 656). The court held that the rule of *respondeat superior* applied to professional employees of charitable hospitals as well as to administrative employees and that the distinction theretofore made between the two classes of employees should be abrogated.

The impact of the *Bing* decision upon the parallel problem with respect to Boards of Education is self-evident. The doctrine of *respondeat superior* must be held to be applicable to the professional employees of Boards of Education just as it is applicable to the professional employees of charitable institutions.

Only one case on this subject was decided by the Court of Appeals after the *Bing* case and that is the case of *Luce* v. *Board of Educ.* (3 N Y 2d 792), discussed above. The *Luce* case was decided on May 24, 1957, only eight days after the decision of the *Bing* case on May 16, 1957. As has been pointed out above, the plaintiff's attorney in the *Luce* case conceded that the old rule of the nonliability of Boards of Education was applicable. The Court of Appeals therefore did not have to consider the impact either of the *Bernardine* case or the *Bing* case.

Hence the *Luce* case is not a barrier to our holding that the doctrine of *respondeat superior* applies to a Board of Education in its relationship to teachers employed by it and that it is therefore liable for the negligence of the teachers.

We now so hold and accordingly we find that the charge by the trial court in this case was correct.

The judgment appealed from should therefore be affirmed, with costs.

WILLIAMS, P. J., and HENRY, J. (dissenting). We dissent and vote to reverse the judgment and grant a new trial. While we agree with the general principle of liability of a Board of Education for the negligence of its teachers stated in the prevailing opinion, we fail to find any evidence in this case that the defendant teachers were negligent. Plaintiffs allege that they allowed a bench to be in a location so near the playing field that it constituted a hazard to the players. There was evidence that the infant plaintiff in attempting to catch a foul ball which had been hit into the air near the third base line ran into a spectator, hit the bench and fell, sustaining injuries. There was also evidence that the bench was then halfway between the fence and the third base line, whereas it had never been in that position before but had been back against the fence for all previous games. There is no evidence as to how, when, or by whom the bench had been moved from its usual location against the fence to the place where the accident occurred. As stated in the prevailing opinion, it was obscured from the view of the baseball players. It was also obscured from the view of the defendants. No witness saw it there before the accident. If its presence there constituted a hazard to the players, defendants could not be held liable for permitting it to be there unless and until they had notice thereof. There is no proof of actual notice and no proof that the condition existed for any length of time sufficient to constitute constructive notice. On this record it cannot be found that the accident resulted from any lack of proper supervision by the defendants.

(*Peterson* v. *City of New York,* 267 N. Y. 204; *Thompson* v. *Board of Educ.,* 280 N. Y. 92.) "To cast [defendants] in damages under the facts of this case would be thrusting upon teachers a responsibility greater than reasonable caution requires." (*Thompson* v. *Board of Educ.,* 255 App. Div. 786, dissenting memorandum LAZANSKY, P. J., and ADEL, J., revd. 280 N. Y. 92.) Adequate supervision would not have prevented the accident. (*Turano* v. *City of New York,* 17 A D 2d 191.)

BASTOW and McCLUSKY, JJ., concur with HALPERN, J.; WILLIAMS, P. J., and HENRY, J., dissent and vote to reverse and grant a new trial in opinion.

Judgment affirmed, with costs.