231

NANCY H. DRIES et al., Appellants, v DAVID G. GREGOR, Respondent, et al., Defendants. (Appeal No. 1.)

NANCY H. DRIES et al., Appellants, v PARHLADKUMAR J. AGARWAL, Respondent, et al., Defendants. (Appeal No. 2.)

NANCY H. DRIES et al., Appellants, v DAVID G. GREGOR et al., Defendants; ALAN HENDERSON et al., Respondents. (Appeal No. 3.)

NANCY H. DRIES et al., Appellants, v MERCY HOSPITAL OF WATERTOWN, Respondent, et al., Defendants. (Appeal No. 4.)

Fourth Department, January 24, 1980

**APPEARANCES OF COUNSEL**

*Williams, Micale & Wells* (*Peter N. Wells* of counsel), for appellants.

*Smith, Sovik, Kendrick, McAuliffe & Schwarzer, P. C. (Martin F. Kendrick* of counsel), for David G. Gregor, respondent.

*Martin, Ganotis & Brown, P. C. (Paul A. Brown* of counsel), for Alan Henderson and another, respondents.

*Wilmott, Wisner, McAloon & Scanlon (Michael D. Saunders* of counsel), for Mercy Hospital of Watertown, respondent.

**OPINION OF THE COURT**

CARDAMONE, J. P.

The appeal in this medical malpractice case requires us to state what is the appropriate charge to a jury where plaintiffs' theory of malpractice is based on a lack of informed consent.

■ A surgical procedure known as a "quadrant resection" of the right breast was performed by defendant Dr. David G. Gregor on plaintiff, Mrs. Nancy Dries, on November 7, 1974 at defendant Mercy Hospital in Watertown, New York. After the surgery, she and her husband, Paul Dries, commenced a medical malpractice suit against the surgeon, the hospital, the pathologist and two anesthesiologists. The action against the pathologist was dismissed prior to trial. A jury trial resulted in judgments of no cause for action in favor of the other defendants. We affirm the judgment with respect to all defendants, except for the surgeon, Dr. Gregor. For the reasons which follow we believe that in his case there should be a new trial limited to the issue of damages only.

After a routine mammogram revealed a "lesion" or suspicious condition in Mrs. Dries' right breast, her gynecologist referred her to defendant, Dr. Gregor, a Watertown surgeon. The radiologist's X-ray report revealed a "positive" finding of a lesion 25 mm—less than one inch—in diameter, which was an indication of a possible cancer. Dr. Gregor was unable to locate a discrete palpable lump in Mrs. Dries' breast by physical examination, and plaintiff herself reported no lump or past history of a lump. On the basis of the radiologist's report and the physical examination of plaintiff, Dr. Gregor advised Mrs. Dries on November 1, 1974 of the advisability for a biopsy in order to ascertain whether the "lesion" was cancerous. Plaintiff agreed to a biopsy procedure which was performed a week later at Mercy Hospital by Dr. Gregor under general anesthesia. During the surgery substantial tissue was removed from Mrs. Dries' right breast. Three segments of tissue each measuring 6 or 7 centimeters—2½ to

2¾ inches—were excised. None of this tissue was found to be malignant.

Plaintiffs' complaint alleged malpractice arising from a lack of informed consent, i.e., that she was neither advised of nor had she consented to a "quadrant resection" or "partial mastectomy" procedure. The complaint also alleged "negligent" malpractice against Dr. Gregor. At the trial Mrs. Dries testified that the terms "quadrant resection" or "mastectomy" had never been mentioned to her by Dr. Gregor or by any of the other doctors. She stated that the only medical term used to describe the proposed surgery was "biopsy". Her understanding of what was to be done derived from a conversation which she and her husband had with Dr. Gregor at his office on November 1, 1974, the week before the operation. She was told that "they are going to just take a snip out of this lump, and then they will send it to the lab to be examined, to see if I do have cancer or not." She testified that after the surgery "the top of my breast was gone" and stated that she had no indication that this was a possible risk she faced in this surgical procedure. Dr. Gregor's testimony did not contradict plaintiff's version of the extent of the consent instructions or explanation given to plaintiffs. He conceded that he could not recall ever using the term "quadrant resection" in his discussion with Mrs. Dries and her husband.

■ The theory of lack of informed consent in medical malpractice actions presents conceptual difficulties arising from the awkward mixture of assault and battery in a suit based upon negligence. A brief look at their ancestry clarifies their differences. Assault and battery is a descendant of the early English common-law action of trespass. Negligence, on the other hand, traces its ancestry back to another ancient common-law writ titled an action of trespass on the case. Originally they were related to each other. The older action of trespass developed new variations which became separate forms of action. One variety was "upon a special case" or, later, simply "trespass on the case". (Plucknett, A Concise History of the Common Law [2d ed], pp 335, 336.) Trespass was the remedy for direct injuries and trespass on the case for indirect injuries. These common-law actions have now been abandoned in modern practice, particularly the artificial classification of injuries as direct or indirect. The law today looks instead to the intent of the wrongdoer or to his negligence. In their evolution the action of trespass remained as the remedy

for all intentional wrongs and action on the case was extended to include injuries which were not intended but were merely negligently inflicted (Prosser, Law of Torts [4th ed], § 7, p 28). Trespass on the case, so Plucknett tells us, had become distinct from trespass by 1390, and as early as the 16th century had evolved as the remedy for libel and slander, negligence and deceit (Plucknett, A Concise History of the Common Law [2d ed], p 336). Battery remains by definition an intentional tort, just as its progenitor trespass. One is subject to liability to another for battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other * * * and (b) a harmful contact with the person of the other directly or indirectly results" (Restatement, Torts 2d, § 13). Negligence as the direct descendant of trespass on the case has a different conceptual basis than battery because negligence includes those unintended wrongs which one actor causes to another.

To encapsulate in a medical malpractice case such divergent legal theories as an intended wrong predicated on a battery and a negligent or unintended wrong is at the very least confusing, if not erroneous. Such a charge presents a lay jury with the nearly impossible task of sorting out legal theories the historic roots and present day definitions of which are mutually exclusive, i.e., one cannot commit an intended and unintended act at the same time.

We believe that medical treatment beyond the scope of a patient's consent should not be considered as an intentional tort or species of assault and battery as it has been viewed in the past (see, e.g., *Schloendorff v Society of N. Y. Hosp.*, 211 NY 125;[1] *Darrah v Kite*, 32 AD2d 208). The doctor in a malpractice case is ordinarily not an actor who intends to inflict an injury on his patient and any legal theory which presumes that intent appears to be based upon an erroneous supposition. Instead, the doctor is not one who acts antisocially as one who commits assault and battery, but is an actor who in good faith intends to confer a benefit on the patient (McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn L Rev, 381, 416-424). The text writers

---

1. *Schloendorff's* continued vitality has been questioned. The hospital *respondeat superior* holding of *Schloendorff* was overruled in *Bing v Thunig* (2 NY2d 656) and the charitable immunity holding of *Schloendorff* was questioned in *Mrachek v Sunshine Biscuit* (308 NY 116, 120); *Musso v Westfield Mem. Hosp.* (64 AD2d 851, 852) and *Domino v Mercurio* (17 AD2d 342, 349).

state that the use of assault and battery terminology has been declining in malpractice suits and that negligence concepts are preferred. Negligence standards which deal with the possession and use of skill and due care better accord with the realities of the physician-patient relationship (1 Louisell and Williams, Medical Malpractice, par 8.09). Further, the choice of legal theory has important ramifications including differing time limitations (CPLR 214, 214-a, 215), whether expert testimony is required, and the nature of damages and insurance coverage of the defendant physicians' policy (2 Louisell and Williams, Medical Malpractice, par 22.08). From a practical standpoint, the conduct of the parties should be measured by a negligence analysis in both "informed consent" and "negligent" malpractice actions.

■ We turn to the appropriate standard to be applied in this case. Predicated on the patient's right of self-determination or to control his own body is the physician's correlative duty to disclose the risks attendant upon the proposed surgical procedures.

In *Fogal v Genesee Hosp.* (41 AD2d 468) we discussed the doctor's duty to disclose and the required scope of that duty. In *Fogal* (at p 473) we adopted the general standard of conduct reasonable under all the circumstances. Focus must first be placed on the duty imposed upon the doctor to communicate with the patient. The patient has the burden of proving that the doctor failed to inform her adequately of the material risks before securing consent. The focus then shifts to the patient's right to decide whether to proceed. This right is not a subjective one to be asserted after the medical procedure has been performed; *it is objective and measured by what a reasonably prudent person in this patient's circumstances,* having sufficient knowledge of the risks incident to the surgical procedures would have decided at that time *(Fogal v Genesee Hosp., supra,* at p 474; *Zeleznik v Jewish Chronic Disease Hosp.,* 47 AD2d 199). It is not enough for plaintiff to prove merely that the defendant doctor has failed properly and fully to inform her and that she did not, therefore, know of the risk. Plaintiff must also prove that a reasonably prudent person having been so informed would not have consented to the surgical procedure performed upon her (see PJI 2:150A). To state it in other terms, the causal connection between a doctor's failure to perform his duty to inform and a patient's right to recover exists only when it can be shown

objectively that a reasonably prudent person would have decided against the procedures actually performed. Once that causal connection has been established, the cause of action in negligent malpractice for failure to inform has been made out and a jury may properly proceed to consider plaintiff's damages *(Canterbury v Spence,* 464 F2d 772, 790, cert den 409 US 1064; Note, Informed Consent in Medical Malpractice, 55 Cal L Rev 1396, 1411; Note, 75 Harv L Rev 1445, 1446-1449).[2]

The trial court submitted this case with a series of seven questions and directed the jury to answer them in accordance with the charge given. In response to Question 6, the jury found a lack of informed consent to the surgery performed. On the basis of the trial court's charge on informed consent, this constituted a finding by the jury that a reasonably prudent person would not have consented to the surgical procedure performed on Mrs. Dries. In other words, causality was established by the jury's affirmative response to Question 6. Question 7 asked the jury to decide whether plaintiffs had proven that the negligence or act of malpractice of Dr. Gregor was a proximate cause of the "damage". The jury answered "no" to this question. Plainly plaintiffs suffered damages and we find that the answer by the jury to Question 7 is, therefore, against the credible weight of the evidence. Having established by her proof that the doctor failed to inform her of the material risks —a point practically conceded—and the jury's response to Question 6 having determined that a reasonably prudent person would not have consented to this kind of surgical procedure had she been so advised, the plaintiff should have been entitled to an award for her damages. Accordingly, there should be a new trial against the defendant surgeon restricted to the issue of damages alone. Where, as here, damages are distinct and separable, that issue should be tried separately (CPLR 4404; *Hogue v Wilson,* 51 AD2d 424, 426; 4 Weinstein-Korn-Miller, NY Civ Prac., par 4404.34).

█ Finally, we conclude that the issue of a new trial, which we could in any event grant in the interest of justice, has been preserved for our review because plaintiffs' motion to set aside the verdict adequately raised the inconsistency of the verdict on the questions submitted by the trial court and plaintiffs

---

**2.** We note that section 2805-d of the Public Health Law, inapplicable in the instant case because surgery was performed in November, 1974 and the statute became effective July 1, 1975, essentially codifies the above analysis (§ 2805-d, subds 1, 3). Compare PJI 2:150A with PJI 2:150B (1979 Supp, pp 117-124).

appealed from the order denying their motion to set the verdict aside on that ground as well as from the judgment.

The judgment in plaintiffs' action against defendant Gregor should be reversed and a new trial should be granted in accordance with the above opinion. The other judgments should be affirmed.

HANCOCK, JR., SCHNEPP and CALLAHAN, JJ., concur with CARDAMONE, J. P.; MOULE, J., dissents and votes to affirm in the following memorandum. The appellant now complains of the trial court's charge to the jury concerning liability of defendant Gregor. No exception, however, was taken at the time of trial and the law stated by the trial court became the law of the case (*Brown v Du Frey,* 1 NY2d 190, 195-196; *Cornwell v Safeco Ins. Co. of Amer.,* 42 AD2d 127, 139). I do not believe that a party should be permitted to acquiesce in a Judge's charge and then, if the verdict is unfavorable, claim error in it.

Appeal No. 1.—Judgment and order reversed, on the law and facts, with costs and a new trial granted.

Appeals Nos. 2, 3, 4.—Judgments and orders unanimously affirmed.