Morris SHINN, Plaintiff,

v.

ST. JAMES MERCY HOSPITAL, Nasar A. Chaudhry, and Hungi Eswara, Defendants.

No. CIV-83-577T.

United States District Court, W.D. New York.

Dec. 16, 1987.

Julien, Schlesinger & Finz, P.C. (Donald Grady, of counsel), New York City, for plaintiff.

Damon & Morey (Mark Spitler, of counsel), Buffalo, N.Y., for St. James Mercy Hosp.

Maloney, Gallup, Roach, Brown & McCarthy, P.C. (Joseph McCarthy, of counsel), Buffalo, N.Y., for Hungi Eswara.

Johnstone, Skok, Loughlin & Lane (Franz J. Skok, of counsel), New York City, for Nasar A. Chaudhry.

## INTRODUCTION

TELESCA, District Judge.

Currently before the Court are several post-trial motions filed by defendants. Plaintiff Morris Shinn brought this action alleging that defendants Dr. Nasar A. Chaudhry ("Chaudhry"), Dr. Hungi Eswara ("Eswara"), and St. James Mercy Hospital ("St. James") were negligent in their care and treatment of Mr. Shinn while he was a patient at St. James in 1981. A jury trial was had in this Court commencing on October 26, 1987. On November 4, the jury returned a verdict finding: (1) no liability on the part of any of the defendants for negligence in the diagnosis, care, and treatment of Morris Shinn; (2) liability on the part of Dr. Chaudhry for failure to obtain Morris Shinn's informed consent to the administration of certain drugs; (3) no liability on the part of Dr. Eswara for failure to obtain Morris Shinn's informed consent; (4) vicarious liability on the part of St. James for the actions of Dr. Chaudhry; and (5) apportioning 99% of the liability to Dr. Chaudhry and 1% to St. James. The Court granted the parties until November 13, 1987 to file post-trial motions.

Dr. Chaudhry has moved pursuant to Fed.R.Civ.P. 50 for judgment notwithstanding the verdict, or, in the alternative, for an order pursuant to Fed.R.Civ.P. 59 for a new trial. Defendant St. James has moved pursuant to Fed.R.Civ.P. 49(b) to correct

the verdict by apportioning 0% fault to St. James and 100% fault to Dr. Chaudhry, and for judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b) with respect to the jury's finding of vicarious liability on the part of St. James for the acts of Dr. Chaudhry. Plaintiff Morris Shinn has made no post-trial motions.

I hold that the jury's verdict finding Dr. Chaudhry liable for failing to obtain Morris Shinn's informed consent is against the weight of the evidence, and cannot stand. In light of this determination, I decline to address at this time the remaining motions of Dr. Chaudhry and St. James.

## FACTS

Because my ruling concerns only that portion of the verdict involving the issue of informed consent to the administration of Dilantin and Phenobarbital, I restrict my recitation of the facts primarily to those facts relevant to plaintiff's claims against the defendant physicians. The following recitation of facts views the evidence in a light most favorable to the plaintiff. *Dominic v. Consolidated Edison Company of New York, Inc.*, 822 F.2d 1249, 1251 (2d Cir.1987).

On February 16, 1981, the plaintiff Morris Shinn, a seaman recruit in the Navy, was visiting his parents in the State of New York. Following a severe headache resulting in unconsciousness, Mr. Shinn was taken by ambulance to the emergency room at St. James. Mr. Shinn was examined by Dr. Chaudhry and admitted to the hospital. (T. 166–174) On February 17, Dr. Eswara examined Mr. Shinn as a neurological consultant. (T. 47)

On February 18, two days after his admission, Mr. Shinn exhibited seizure-like activity. The medical records indicate the Mr. Shinn experienced "recurrent syncopal episodes, each lasting a minute or two and occurring every five minutes or so," including spasms and crying out. (T. 190–191) Based on this seizure activity, Dr. Chaudhry prescribed Dilantin, and Dr. Eswara concurred in that prescription. (T. 74, 85, 210, 650). They viewed Mr. Shinn's seizure

activity as a life-threatening situation. (T. 85, 650–652)

There was conflicting testimony concerning the nature of the discussions between the physicians and Mr. Shinn prior to the administration of Dilantin. Dr. Eswara testified that he could not recall whether he had any discussions with Mr. Shinn concerning the possible side effects of Dilantin therapy. (T. 662) Dr. Chaudhry initially testified that he could not recall the nature of his discussions with Mr. Shinn concerning the administration of Dilantin, but that it was his practice to discuss with a patient the possible side effects of medications prior to their administration. (T. 201–203, 207–209) However, Dr. Chaudhry later testified that he discussed with Mr. Shinn the side effects of Dilantin, and that he routinely discussed with his patients the possibility of Stevens–Johnson syndrome prior to the administration of Dilantin. (T. 684–685)

Mr. Shinn initially testified that neither Dr. Eswara nor Dr. Chaudhry discussed with him the possible side effects of Dilantin. (T. 270–271) He later stated that the physicians had discussed the Dilantin treatment with him, but that his memory concerning the conversation was "fuzzy". (T. 331) Mr. Shinn further testified that while he was generally aware that certain medications could have side effects, he was not aware that Dilantin could produce Stevens–Johnson Syndrome. He stated, "I did not know that this could happen to me, because if I had I would have not taken the damn shit." (T. 515–516, 518–519)

Throughout his stay at St. James, Mr. Shinn continued to receive Dilantin. In addition, he received Phenobarbital and several other medications. (T. 114, 117) From February 18 through March 2, Mr. Shinn continued having seizures. (T. 117–120, 701) On March 1, Mr. Shinn experienced approximately 21 seizures. (T. 660) Due to the continued seizure activity, commencing February 23, Drs. Eswara and Chaudhry attempted to have Mr. Shinn transferred to Strong Memorial Hospital where continuous observation and advanced diagnostic procedures were avail-

able. (T. 120–123, 251–254, 652) However, Mr. Shinn and his family opposed the transfer, and insisted that he be moved to a Naval facility. (T. 507–508, 541, 555–557, 676–677) Mr. Shinn remained at St. James through March 3, 1981 when he was transferred to the Portsmouth, Virginia Naval Medical Center. (T. 243, 248)

Following his admission to the Portsmouth Naval Medical Center, Mr. Shinn was diagnosed as suffering from a full-blown Stevens–Johnson Syndrome. (T. 341) He developed a rash all over his body consisting in "raised, macular lesions which developed bullous vesicles," corneal erosion, fevers, cellulitis, and penile and scrotal lesions. (T. 341) Mr. Shinn also developed a corneal ulcer which has virtually blinded him in his right eye. His eyes are sensitive to light, and he wears sunglasses at all times. (T. 291) Mr. Shinn's eyes are red and dry, and he must disinfect them each morning. (T. 292) There was expert testimony that the impairment of Mr. Shinn's vision was permanent, and that his vision impairment is the result of Stevens–Johnson syndrome. (T. 569, 571, 576).

### THE EXPERT TESTIMONY

This case involved a substantial amount of medical expert testimony. Concerning the question of negligence in the diagnosis, treatment, and care of Mr. Shinn, the primary issue was whether the defendant physicians exercised due care in initially diagnosing Mr. Shinn as suffering from organic seizures rather than emotional or pseudo-seizures, and in continuing to treat his symptoms as resulting from organic seizures throughout his hospitalization at St. James.

Plaintiff's expert, Dr. Milford Blackwell, and defendants' expert, Dr. Patrick Hughes, agreed that while Dilantin and Phenobarbital are effective in the treatment of organically caused seizures, these medications are of no benefit in the treatment of pseudo-seizures. (T. 365–366, 717–719, 749) The experts also agreed that Dilantin and Phenobarbital are competent producing causes of Stevens–Johnson Syndrome. (T. 387, 738) Dr. Blackwell and Dr. Hughes further agreed that Stevens–Johnson Syndrome is an extremely rare, hypersensitivity reaction to drugs including, among others, Dilantin, Phenobarbital, aspirin, and penicillin. (T. 239–241, 450–451, 721) Dr. Blackwell testified in pertinent part as follows:

Q. And, Doctor, the PDR states that Stevens–Johnson Syndrome is a very rare reaction, doesn't it?

A. Yes.

Q. It's not the reaction that you would expect to run into in 1 out of 100 cases, is it?

A. No.

Q. In fact, Doctor, can you give us a percentage of how often you as a doctor might expect to see this reaction?

A. I would expect to see it maybe once in 30 years.

Q. Once in 30 years?

A. Once in 30 years. (T. 474)

Similarly, Dr. Hughes testified that in 25 years of practice he had never had a patient experience Stevens–Johnson Syndrome reaction to the drug Dilantin. (T. 723) As Dr. Hughes stated, "I would say I am at more risk going home to Buffalo tonight on the New York State Thruway than I would be by taking Dilantin." (T. 723)

Dr. Hughes and Dr. Blackwell further agreed that a patient suffering from organic seizures must be treated immediately. Otherwise, he can suffer brain damage or even death. (T. 458, 716) As Dr. Hughes testified:

Now, if you don't stop the seizures and if they continue on, thirty percent of these people will die. Okay?

If you don't stop them within two hours, there is a significant chance that that individual will end up with brain damage, and I'm talking just not minor brain damage. I'm talking paralysis; I'm talking a vegetative state; I'm talking intellectual deterioration? O.K.?

(T. 716–717) Further, both experts agreed that the proper treatment of organic seizures is the administration of Dilantin or

Phenobarbital, or alternatively, Tegretol, which is also known to produce Stevens–Johnson Syndrome. (T. 455–456, 487–488, 717–720) Moreover, Dr. Blackwell testified that there is no known means of determining whether an individual is hypersensitive to Dilantin or any of these drugs prior to administration. (T. 454)

The primary disagreement between the two experts concerned whether Dr. Chaudhry and Dr. Eswara were correct in treating Mr. Shinn for organic, rather than pseudo-seizures. Dr. Blackwell testified that based on his review of Mr. Shinn's medical records, in his opinion Mr. Shinn suffered from pseudo-seizures and it was a departure from accepted medical practice to prescribe Dilantin for him. (T. 373, 376, 381) However, Dr. Hughes testified that it is extremely difficult to distinguish between pseudo and organic seizures without prolonged neurological testing. In his opinion, the proper procedure, as followed by Dr. Chaudhry and Dr. Eswara, is to treat the patient as one experiencing organic seizures and to administer an anti-convulsive medication. (T. 712–717) Moreover, according to Dr. Hughes, 50% of those patients suffering from pseudo-seizures also experience organic seizures. (T. 718)

On the issue of informed consent, Dr. Blackwell testified that prior to the administration of Dilantin and Phenobarbital, a physician should inform the patient about the possible harmful side effects that could occur, including Stevens–Johnson syndrome. (T. 377–378) Dr. Hughes offered no testimony on the issue of informed consent.

### THE JURY CHARGE AND VERDICT

As against Dr. Chaudhry and Dr. Eswara, the jury was charged on four possible theories of liability: (1) that the physicians failed to properly diagnose the nature of Mr. Shinn's condition; (2) that the physicians failed to give the proper medication in the treatment of Mr. Shinn's condition; (3) that the physicians failed to discontinue the prescribed medications of Dilantin and Phenobarbital; and (4) that the physicians failed to obtain Mr. Shinn's informed consent to the administration of the medications by failing to advise him of the possible adverse side effects from the use of Dilantin and Phenobarbital, particularly, Stevens–Johnson Syndrome. (T. 861) No objection was made to this aspect of the charge.

On November 4, 1987, the jury returned its verdict by way of a completed special verdict form, and confirmed that verdict upon being polled. The jury found no liability as against St. James Mercy Hospital, Dr. Chaudhry, or Dr. Eswara, arising from the diagnosis, care, or treatment of Mr. Shinn. The jury found liability on the part of Dr. Chaudhry—but not on the part of Dr. Eswara—for failing to obtain Mr. Shinn's informed consent to the use of Dilantin and Phenobarbital. The jury assessed Mr. Shinn's damages at $625,000, and further found that St. James Mercy Hospital was vicariously liable for any negligence found on the parts of Dr. Chaudhry and Dr. Eswara.

### DISCUSSION

Dr. Chaudhry has moved for judgment notwithstanding the verdict on the basis that the jury's finding him liable for failing to obtain Mr. Shinn's informed consent to the administration of Dilantin and Phenobarbital is without support in the record. Defendant Chaudhry's attorney moved for a directed verdict at the close of plaintiff's case on the grounds that plaintiff had not made out a prima facie case on all grounds, and renewed his motion at the close of all the evidence. Therefore, he is now entitled to bring this motion for judgment notwithstanding the verdict pursuant to Fed.R.Civ. P. 50(b). Judgment notwithstanding the verdict should be "granted only when, viewing the evidence most favorably to the party other than the movant, 'there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Sarus v. Rotundo*, 831 F.2d 397, 400 (2d Cir.1987) (quoting *Diebold v. Moore, McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57 (2d Cir.1986); *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980)).

The contours of Mr. Shinn's action for medical malpractice based on lack of in-

formed consent are set forth in N.Y.Pub.H. L. Section 2805–d (McKinney 1985). To establish a cause of action based on lack of informed consent, the patient must first prove that the person providing professional treatment or diagnosis failed to disclose to the patient the various alternatives and the reasonably foreseeable risks and benefits involved which a reasonable medical practitioner under similar circumstances would have disclosed. N.Y.Pub.H.L. Section 2805–d(1); *Goodreau v. State of New York*, 129 A.D.2d 978, 514 N.Y.S.2d 291 (4th Dept.1987) (memorandum decision); *Hylick v. Halweil*, 112 A.D.2d 400, 401, 492 N.Y.S.2d 57 (2d Dept.1985) (memorandum decision).

 Construing the evidence in a light most favorable to the plaintiff, the jury could reasonably have found that Dr. Chaudhry failed to inform Mr. Shinn of any of the risks or benefits associated with the administration of Dilantin and Phenobarbital, including Stevens–Johnson Syndrome. The qualitative insufficiency of the disclosures made by Dr. Chaudhry was supported by the expert testimony of Dr. Blackwell as required under New York law. *See Hylick v. Halweil, supra* at 401, 492 N.Y.S.2d 57 (citing CPLR Section 4401–a).[1]

 Once the qualitative insufficiency of the information given has been shown, the plaintiff must also prove "that a reasonably prudent person in the patient's po-sition would not have undergone the treatment or diagnosis if he had been fully informed". N.Y.Pub.H.L. Section 2805–d(3); *Goodreau v. State of New York, supra* 129 A.D.2d at 978, 514 N.Y.S.2d 291; *Flores v. Flushing Hospital & Medical Center,* 109 A.D.2d 198, 200, 490 N.Y.S.2d 770 (1st Dept.1985). In making this determination, the fact-finder must "balance the risks associated with having the procedure performed against the risks associated with foregoing it." *Hylick v. Halweil, supra* 112 A.D.2d at 402, 492 N.Y.S.2d 57.

It must be emphasized that the determination of what a reasonably prudent person would do is an objective one. Mr. Shinn's testimony that he would not have consented to the drug treatment had he been informed that Stevens–Johnson Syndrome was a risk associated with the administration of Dilantin and Phenobarbital is probative, but not determinative. Once the patient has proved that the doctor failed to inform him adequately, the "focus then shifts to the patient's right to decide whether to proceed. This right is not a subjective one to be asserted after the medical procedure has been performed; it is objective and measured by what a reasonably prudent person in the patient's circumstances, having sufficient knowledge of the risks incident to the surgical procedures would have decided at that time." *Dries v. Gregor,* 72 A.D.2d 231, 236, 424 N.Y.S.2d 561 (4th Dept.1980).

---

1. In light of the expert testimony on this issue, and Dr. Chaudhry's own testimony that he regularly informs his patients of the possible side effect of Stevens–Johnson Syndrome prior to the administration of Dilantin, I do not rest my decision on the qualitative sufficiency of the information given. However, I believe that a physician should not be legally required to inform the patient of every conceivable side effect of a drug prior to its administration. As the New York Court of Appeals has noted, "And it is perhaps the most delicate matter, often with fluctuating indications, from time-to-time with the same patient, whether a physician should advise the patient (or his family), more or less, about a proposed procedure, the gruesome details, and the available alternatives." *Fiorentino v. Wenger,* 19 N.Y.2d 407, 415, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967).

Although Stevens–Johnson Syndrome is listed in the Physician's Desk Reference ("PDR") as a possible side effect of Dilantin, the PDR is not determinative on the physician's duty in obtaining informed consent. Given that Dilantin is a widely used drug in existence for approximately 50 years, and the remoteness of the risk of Stevens–Johnson Syndrome, it is unreasonable to require a physician under the circumstances presented to Dr. Chaudhry to have read every single possible side effect listed in the PDR to Mr. Shinn before obtaining his consent to administration of the drug. At most, the treating physician under those circumstances is only required to advise the patient of the most common side effects—not those that are extremely remote and not seen by many doctors over the full span of their career. To hold otherwise is to impose an unreasonable burden on treating physicians, in effect condemning every doctor who fails to read the complete litany of warnings, precautions, and side effects listed in the PDR to every patient before using or prescribing a drug, regardless of the circumstances.

An examination of the evidence at trial leads to the inescapable conclusion that a reasonably prudent person in Morris Shinn's position on February 18, 1981 would have elected to proceed with the Dilantin therapy even had he been informed of the possible risks and benefits involved.

Plaintiff's attorney asserts that the jury determined Mr. Shinn was actually suffering from pseudo-seizures rather than from organic seizures. This conclusion is neither compelled by the evidence produced at trial nor necessary to the jury's verdict. However, even assuming the jury did so find, that determination is irrelevant as it is based on hindsight. The jury's finding of no liability on the part of Drs. Chaudhry and Eswara arising from the diagnosis, care, and treatment of Mr. Shinn indicates that the jury found the physicians' decision to treat Mr. Shinn as suffering from organic brain seizures was consistent with accepted medical practice.

I recognize that ordinarily, a cause of action for lack of informed consent does not depend on whether the procedure followed by the doctors was proper or improper. *See Garone v. Roberts' Trade School, Inc.,* 47 A.D.2d 306, 312, 366 N.Y.S.2d 129 (1st Dept.1975). However, had the jury in this case accepted Dr. Blackwell's testimony that Mr. Shinn should have been diagnosed on February 18 as suffering from pseudo-seizures, and that he should not have been treated with Dilantin and Phenobarbital, the jury would have been bound to return a verdict of negligence in the diagnosis, care, and treatment of the plaintiff. The jury's finding that neither doctor was negligent is consistent only with a finding that the physicians were correct in treating Mr. Shinn as suffering from organic brain seizures. As a result, any determination on the issue of informed consent must proceed on the assumption that Mr. Shinn should have been informed that he was faced with organic seizures, a life-threatening illness.

Both plaintiff's and defendants' experts agreed that untreated organic seizures are likely to result in severe brain damage and possibly death. Where the patient was facing a life-threatening illness, the New York courts have almost uniformly held that there is no action based on failure to obtain an informed consent to a potentially life-saving procedure. In *Goodreau v. State of New York, supra* 129 A.D.2d at 978, 514 N.Y.S.2d 291, the Fourth Department set aside the trial court's finding of liability for lack of informed consent where the plaintiff was diagnosed as having lymphocytic lymphosarcoma of the right inguinal lymph node. In holding that there was no liability, the court stated:

> The proof established that this form of cancer, if untreated, can spread rapidly to other areas of the body and, if it reaches the internal organs, the likelihood of successful treatment is substantially reduced and chances of survival significantly lessened. Given the life-threatening nature of the illness, it is inconceivable that a prudent person would have declined treatment.

*Id.* Similarly, a person who has just experienced five seizures, faced with a physician's diagnosis of life-threatening organic brain seizures, would not have declined treatment. *See also, Joswick v. Lenox Hill Hospital,* 134 Misc.2d 295, 297, 510 N.Y.S. 2d 803 (Sup.Ct.N.Y.Co.1986) (rejecting contention that parents would not have consented to heart surgery on infant if told that brain damage might result when failure to consent would have resulted in certain death); *Kuncio v. Millard Fillmore Hospital,* 117 A.D.2d 975, 499 N.Y.S.2d 525 (1986) (reinstating jury verdict finding no liability for lack of informed consent where jury could have found that prudent person would have consented to oxygen treatment of premature infants due to perceived risks of brain damage or death despite possibility of blindness); *Brandon v. Karp,* 112 A.D.2d 490, 492, 490 N.Y.S.2d 904 (3d Dept. 1985) (memorandum decision) (upholding jury verdict finding no liability for lack of informed consent where physician needed to locate source of illness endangering patient's life and procedure performed was logical means of determining whether sinus was infected).

My determination that a reasonable person would have consented to the Dilantin therapy is further supported by the extreme rarity of a hypersensitivity reaction

to the drug and development of Stevens–Johnson Syndrome. Dr. Blackwell, plaintiff's own expert, testified that Stevens–Johnson Syndrome is a reaction to Dilantin which he would expect to see only once in thirty years of practice. No reasonably prudent person faced with the possibility of brain damage or death from organic seizures would decline treatment designed to control those seizures solely because of a statistically remote possibility of a severe side effect from the life-saving drug treatment.

Moreover, the alternative drugs of choice, Phenobarbital and Tegretol, were also competent producing causes of Stevens–Johnson Syndrome. Neither the physicians nor the patient were able to project which, if any, of these medications would lead to Stevens–Johnson Syndrome. Therefore, even if Mr. Shinn had been advised of the alternative procedures, there is no evidence that he would have chosen to forego the Dilantin therapy. Any reasonably prudent person faced with the choice between life-threatening organic seizures and a statistically remote possibility of developing Stevens–Johnson Syndrome would choose to receive the drug treatment.

■ In addition, N.Y.Pub.H.L. Section 2805– d(2) explicitly limits the right of action to recover from medical malpractice based on lack of informed consent to cases involving invasive diagnostic procedures or non-emergency treatment. Although there appears to be no caselaw on this issue, I believe that the New York courts would hold that "emergency treatment" encompasses those situations in which a physician is faced with a life-threatening situation requiring immediate action. Such was the case here. Therefore, Section 2805–d(2) bars Mr. Shinn from maintaining an action for lack of informed consent arising from the emergency Dilantin treatment rendered him at St. James Mercy Hospital.

Those cases in which the New York courts have either upheld a jury finding of liability based on lack of informed consent or have remanded for such a determination can be distinguished from this situation because they did not involve the combination of a life-threatening illness and a statistically remote possibility of a side effect.

*See Suria v. Shiffman,* 67 N.Y.2d 87, 98, 499 N.Y.S.2d 913, 490 N.E.2d 832 (1986) (upholding jury verdict based on lack of informed consent where transsexual who consented to having breast infection drained was actually given mastectomy of both breasts resulting in substantial scarring); *Alberti v. St. John's Episcopal Hospital–Smithtown,* 116 A.D.2d 612, 497 N.Y.S.2d 701 (1986) (remanding for new trial on issues of malpractice and informed consent arising from reconstructive surgery); *Tenney v. Bedell,* 624 F.Supp. 305, 306 (S.D.N.Y.1985), *aff'd.* 800 F.2d 1128 (2d Cir.1986) (upholding jury verdict finding lack of informed consent where evidence indicated that patient could have decided to defer operation if aware of risk of fecal incontinence); *Davis v. Caldwell,* 54 N.Y. 2d 176, 182–183, 445 N.Y.S.2d 63, 429 N.E. 2d 741 (1981) (upholding jury verdict for lack of informed consent to mastectomy where a patient was incorrectly advised that she had cancer rather than a possibility of cancer and biopsy was viable alternative); *Dries v. Gregor,* 72 A.D.2d 231, 236, 424 N.Y.S.2d 561 (4th Dept.1980) (finding liability based on lack of informed consent to quadrant resection of plaintiff's breast where plaintiff was informed only that a biopsy was to be performed and no cancer was found); *but cf. Eley v. Brooklyn Cumberland Medical Center,* 55 A.D.2d 925, 390 N.Y.S.2d 633 (2d Dept.1977) (memorandum decision) (affirming jury finding of lack of informed consent where parents would not have consented to open heart surgery upon infant had they been advised of dangers of post-operative embolism and brain, heart, or lung damage).

The patient's right of action to recover for medical malpractice based on lack of informed consent is not absolute—New York Pub.H.L. Section 2805–d places certain limitations on that right. I find, as a matter of law, that a physician faced with a life-threatening situation may not be held liable based on failure to obtain an informed consent where the treatment administered results in a side effect or complication that is so rare as to be statistically remote.

Where a motion for judgment notwithstanding the verdict is granted, the

Court must also rule whether the motion for a new trial should be granted in the event the judgment is thereafter vacated or reversed. Fed.R.Civ.P. 50(c)(1). That motion is denied. Although defendants' remaining motions would be decided by this Court upon remand, I see no major errors in the course of the trial and no irregularities in the jury's verdict which would require a new trial.

WHEREFORE, the motion of defendant Nasar Chaudhry for judgment notwithstanding the verdict on the issue of his liability for lack of informed consent is granted. The motion by defendant Dr. Chaudhry for a new trial pursuant to Fed. R.Civ.P. 59 is conditionally denied. Accordingly, the Clerk shall enter judgment of no cause of action on behalf of all defendants.

SO ORDERED.