**Gordon WILSON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 82 CV 2631.**

United States District Court, E.D. New York.

July 22, 1985.

Florrie L. Wertheimer, P.C., New York City, for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. (Winstanley Luke, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This action under the Federal Tort Claims Act (28 U.S.C. § 2675) seeks damages for personal injury. After injuring his elbow while employed on a barge, the plaintiff underwent two operations at the Staten Island United States Public Health Service Hospital (PHS Hospital). He now suffers from a nearly complete ulnar nerve palsy of the right hand.

Mr. Wilson brings this action for malpractice, arguing that the first operation was premature and that both operations were performed improperly. The case was tried before me without a jury. The following constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### Findings of Fact

On February 3, 1979, plaintiff injured his right elbow while working as a tankerman aboard a barge operated by the Poling Transportation Corporation (Poling). He described the pain as a sensation of "pins and needles" running into his hand (Tr. 169). He continued to work for approximately two weeks before seeking medical assistance (Tr. 194–196).

Twenty days after the accident, Wilson sought medical attention at the PHS Hospital. At that time, he complained of swelling of his right elbow, pain and a tingling sensation in the right hand (Tr. 172).

Wilson initially was treated conservatively, and he did not improve. An electromyographic test (EMG) performed during this period of conservative management produced normal results. Nonetheless, the clinical evidence indicated that Wilson's condition was, in fact, deteriorating. The pain and swelling in his arm continued, and the "tingling" had progressed to numbness and decreased sensation in the fourth and fifth fingers and weakness of the fourth volar interosseous muscles (Tr. 42, 43, 197, 259).

Because of plaintiff's deteriorating condition, his case was presented to a conference of the PHS neurological staff. The physicians at the conference diagnosed an ulnar neuropathy at plaintiff's elbow and recommended a transposition of the ulnar nerve from the back of the elbow to an anterior position.

Accordingly, on April 30, 1979, plaintiff underwent his first operation at the PHS hospital. In addition to performing an anterior transposition of the ulnar nerve, the surgeons removed certain bone spurs and

loose cartilage (loose bodies and osteophytes) from his elbow joint.

Although plaintiff initially experienced a reduction in swelling and a general increase in sensation in his hand, the numbness began to reappear around June, 1979. Plaintiff testified that he noticed a slight "clawing" of his hand after the first operation (Tr. 176). He continued to show no improvement in the ensuing months.

Accordingly, plaintiff reentered the hospital for a second operation, a re-exploration of the right ulnar nerve on November 19, 1980. This procedure did not help the situation and since then plaintiff's condition has grown remarkably worse. He now has an ulnar nerve palsy of the right hand, and suffers from clawing of the ring and little fingers. His grip has weakened substantially and he has experienced a partial loss of flexion and extension of the right elbow.

Wilson clearly is unable to perform his prior employment, and most likely will remain unable to perform tasks requiring dexterity of the right hand. The PHS Hospital declared him "permanently not fit for duty" on March 9, 1981.

On February 11, 1982, Wilson settled his action against Poling, his employer, for $150,000.00, and executed a release extinguishing all claims against Poling, including claims resulting from the negligent medical treatment provided him by the PHS Hospital and its staff. Wilson expressly reserved, however, whatever right he had to sue the United States for damages caused by the PHS Hospital in excess of $150,000.00.

Accordingly, this action was commenced on September 7, 1982.

### The Alleged Malpractice

The evidence concerning the surgery performed on plaintiff and the claims of malpractice consists of the familiar battle of the experts: the testimony of two consulting physicians.

Plaintiff's medical witness was Dr. Howard Balensweig, a retired orthopedic surgeon who had performed approximately eight ulnar nerve transpositions prior to his retirement from active surgery in 1974 (Tr. 4, 29–30). Defendant's counter-evidence came from Dr. Jacobson, a practicing neurosurgeon who has performed approximately thirty-five ulnar nerve transpositions. The testimony of the two doctors is summarized as follows:

### 1979 Operation

Dr. Balensweig testified that the first operation deviated from proper medical and surgical care in several respects. Initially, he claims that the very decision to perform the surgery in April 1979 was itself a deviation, since the operation was then premature. Although Dr. Balensweig conceded that plaintiff's condition began to worsen shortly after he sought medical treatment at the PHS Hospital and that he showed no improvement thereafter, he pointed out that Wilson's EMG's and nerve conduction studies were normal. Accordingly, Dr. Balensweig testified that the decision to perform surgery was improper, since the doctors should have waited to see if Wilson's condition continued to worsen (Tr. 9–10, 24, 25).

As to the operation itself, Dr. Balensweig testified that it was malpractice to remove the spurs and loose bodies from the elbow joint, since plaintiff had not complained of problems with the joint (Tr. 10, 39). Dr. Balensweig conceded, however, that it would be proper for a surgeon to remove loose bodies "if he thinks they are doing harm" (Tr. 22). Finally, Dr. Balensweig concluded that the nerve was transposed improperly causing it to kink and form excessive scar tissue (Tr. 10). In Dr. Balensweig's opinion, the scarring observed at plaintiff's second operation in 1980 could only have been caused by mishandling of the nerve at the first operation.

Dr. Balensweig also stated that the physicians erred in performing both the 1979 and 1980 operations without the benefit of magnification (Tr. 17).

Dr. Jacobson, testifying for the defendant, indicated that the 1979 operation was not premature (Tr. 266). He testified that it was proper for the doctors to rely on the

clinical picture despite the normal EMG studies, since electrical testing is only about seventy-five percent accurate (Tr. 262). Jacobson stated that the clinical picture indicated no improvement in plaintiff's condition and, indeed, showed signs of worsening (Tr. 269, 312–313). In his opinion, prompt diagnosis and treatment is preferred in most cases (Tr. 266, 268).

Dr. Jacobson also testified that the first operation was performed properly (Tr. 272, 325). He stated that the anterior subcutaneous transposition performed on Mr. Wilson is among the most commonly used methods of nerve transpositions recommended by surgeons in the field (Tr. 273–274). Moreover, he testified that the transposition was executed properly. In Dr. Jacobson's opinion, the kinking which Dr. Balensweig attributed to the manner of transposition was actually caused by the fibrotic (scarred) condition of the nerve before the operation (Tr. 286–288), as well as the scarring which occurs naturally during the healing process (Tr. 293, 315).

Although Dr. Jacobson indicated that he prefers to perform such operations under magnification, he noted that the use of magnification does not yield significantly different results (Tr. 317). Finally, Dr. Jacobson indicated that it was proper to remove loose bodies and osteophytes from the elbow joint (Tr. 275).

*1980 Operation*

Dr. Balensweig conceded that, given plaintiff's worsening condition, the decision to perform the second operation was proper (Tr. 37). He concluded, however, that the physicians improperly delayed this second operation from January 1980 to November 1980 (Tr. 15). Dr. Balensweig failed to indicate how plaintiff was injured by this delay.

Regarding the operation itself, Dr. Balensweig concluded that nerve fibers were improperly excised and that the incision made by the surgeons was too small to permit them to adequately re-explore the nerve (Tr. 15–16, 22, 81). More importantly, Dr. Balensweig indicated that the doctors erred in letting the nerve fall back into the same pathway (or "sloppy bed") of scar tissue, thus, leading to further scarring (Tr. 22, 26, 76). He stated that the nerve should have been shifted into an unscarred bed (Tr. 76).

Dr. Balensweig testified that plaintiff "wasn't that bad off" prior to the 1980 operation, but that he worsened considerably thereafter (Tr. 26). He conceded that plaintiff's condition would have remained static if the second operation had not been performed. Likewise, he acknowledged that the scarring of the nerve at the time of the second operation prevented plaintiff from recovering adequately (Tr. 90).

Dr. Jacobson testified that re-exploration of the nerve was proper and that the incision and operation were performed properly (Tr. 277–279). He noted that at the time of the second operation, plaintiff's nerves were "friable" (easy to tear) (Tr. 279). He stated that an adequate removal of the fibrous tissue would necessitate removal of some nerve tissue since there is no "clean break" between the two (Tr. 281). Dr. Jacobson indicated that the prognosis normally would be guarded after surgery on a fibrotic nerve (such as plaintiff's was at the time of the 1980 surgery) (Tr. 287–288).

Dr. Jacobson testified that the method of transposition used in the second operation yields approximately the same results as other available methods (Tr. 334–335). He conceded, however, that several medical authorities criticized the practice of placing a nerve back into a scarred bed (Tr. 323–324).

*Conclusions of Law*

Under the Federal Tort Claims Act, the liability of the United States for a negligent act or omission is determined under the law of the State where the alleged negligence occurred, viz., New York. 28 U.S.C. § 1346(b). Plaintiff's theory of liability is that his condition is the result of the malpractice of surgeons who were admittedly employees of the PHS Hospital.

 Under New York law a doctor is liable for malpractice if he fails to exercise that degree of knowledge, care and skill

expected of the average physician in the same locality and of the same class of physicians to which he belongs, or if he fails to use his best judgment in applying his knowledge and skill. *Pike v. Honsinger,* 155 N.Y. 201, 209, 49 N.E. 760 (1898); *Littlejohn v. New York,* 87 A.D.2d 951, 952, 451 N.Y.S.2d 225, 226 (3d Dept.1982). Thus, the issue in every malpractice action is whether plaintiff has established that what the doctor did or failed to do in his treatment constituted a departure from this standard of care. *Spitzer v. Ciprut,* 80 A.D.2d 891, 437 N.Y.S.2d 27, 28 (2d Dep't 1981). A doctor is not liable simply because an operation does not yield a good result. *Pike v. Honsinger,* 155 N.Y. at 210, 49 N.E. 760.

■ Having heard all the evidence and having reviewed all the exhibits in this case, I conclude that the doctors who performed the first operation did not depart from the standard of care expected of physicians in this locality and class. I accept the testimony of Dr. Jacobson that the PHS doctors acted properly in deciding when to operate on plaintiff's arm, and in performing that operation.[1]

A review of the 1980 operation, however, produces a different conclusion. Although I cannot agree with the testimony of Dr. Balensweig that the doctors committed malpractice in delaying the operation a few months, or in using a small incision and removing some nerve tissue, I do agree that the doctors improperly allowed the ulnar nerve to fall back into a "sloppy bed." Dr. Balensweig's testimony in this regard was bolstered by reference to several medical authorities indicating that a proper "reoperation" would include transposing the nerve to an unscarred bed (Tr. 323–325). Even Dr. Jacobson, who could not justify the procedure utilized, acknowledged that the authorities indicated that placing the nerve back into the same scar bed is an improper procedure (Tr. 324).

■ Accordingly, I find that the physicians deviated from accepted medical practice in placing the nerve back into the scarred bed. I find further that this deviation aggravated plaintiff's injuries. Upon examination of the entire record, I conclude that 40% of plaintiff's damages flow from this aggravation of plaintiff's injuries; the original 60%, for which defendant, as an independent, successive tortfeasor, is not liable, is attributable solely to Poling, the original and prime tortfeasor.[2] *See Derby v. Prewitt,* 12 N.Y.2d 100, 105–06, 236 N.Y. S.2d 953, 958, 187 N.E.2d 556, 561 (1962); *Zillman v. Meadowbrook Hospital Co., Inc.,* 45 A.D.2d 267, 358 N.Y.S.2d 466, 469 (2d Dep't 1974).

### Damages

In addition to an award for his pain and suffering, plaintiff is entitled to be compensated for loss of past earnings and for impairment of future earning ability. C.P. L.R. § 4111(d).

### 1. *Pain and Suffering*

■ I award $75,000 for all past and all future pain and suffering. Recently, the Second Circuit held that awards for future pain and suffering should be discounted to their present value, unless the Court finds on the evidence presented that the rate of inflation and the nominal rate of interest

1. The government argued that plaintiff's claim for damages allegedly resulting from the first operation is barred by the statute of limitations, 28 U.S.C. § 2401(b), since, according to the government, plaintiff knew of his condition and its cause by October 22, 1979, and did not file a tort claim against the United States within two years of that date. *United States v. Kubrick,* 444 U.S. 111, 118–25, 100 S.Ct. 352, 357–61, 62 L.Ed.2d 259 (1979). Plaintiff, on the other hand, urges the Court to adopt a continuous treatment rule, thereby rendering this action timely. In light of my disposition of this claim, I need not reach this issue.

2. Poling's liability for the acts of a successive tortfeasor is vicarious in nature, and not the result of its own culpability. *See Musco v. Conte,* 22 A.D.2d 121, 124–25, 154 N.Y.S.2d 589, 594 (2d Dep't 1964); *Kucinski v. Rish,* 108 Misc.2d 188, 437 N.Y.S.2d 250, 253 (Queens County 1981). Hence, even if Poling had not settled, defendant, as the successive tortfeasor, could not have sought contribution from Poling, the prior tortfeasor. *Zillman v. Meadowbrook Hospital Co., Inc.,* 45 A.D.2d 267, 358 N.Y.S.2d 466, 468, 470 (2d Dep't 1974). Accordingly, no further apportionment of damages is necessary.

offset each other. *Metz v. United Technologies Corp.*, 754 F.2d 63, 67–68 (2d Cir. 1985). Although some evidence was presented regarding the use of the offset method as it relates to future earning power, the record is devoid of any evidence regarding the applicability of this method of discounting, or any other method, to an award of future pain and suffering. Accordingly, in settling a form of judgment, the parties are directed to stipulate to the present value of this award, or, if no agreement can be reached, to submit their respective proposals.[3] *Cf. Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39–40 (2d Cir.1980).

## 2. *Earnings*

█ Both plaintiff's and defendant's economic experts have offered several models for computing the economic losses. After careful consideration of the various models and the record in its entirety, I have elected to adopt defendant's Model III[4] with a slight modification. Dr. Ralls, defendant's expert, conceded that he did not consider the impact of lost fringe benefits in his calculation, and acknowledged that his figures should be revised to that extent (Tr. 367). Dr. Berenson, plaintiff's economic

expert, testified that fringe benefits represent approximately twenty percent of plaintiff's total loss (Tr. 138). Accordingly, I have increased Dr. Ralls' total figure by twenty percent to $276,345.30, reflecting the loss of fringe benefits. *Cf. Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 2549, 76 L.Ed.2d 768 (1983).

## 3. *Reduction*

█ Finally, I reduce the total award by 60% representing that portion of the damages attributable only to Poling.[5]

Accordingly, plaintiff is entitled to a judgment for $110,538.12, representing 40% of his loss of past earnings and impairment of future earning ability. In addition, plaintiff is awarded 40% of the present value of $75,000 (plus pre-judgment interest on the latter amount) for his pain and suffering. The parties are directed to submit a form of judgment on notice.

SO ORDERED.

---

**3.** The Second Circuit has noted that rather than dividing damage awards into pre-judgment and post-judgment components, it is preferable to discount the entire award back to the date of injury, and then to award pre-judgment interest on that amount. *Taliercio v. Compania Empressa Lineas Argentina*, 761 F.2d 126, 129 (2d Cir. 1985).

**4.** Model III, submitted by Dr. Ralls, assumes a perfect offset between wage and salary increases and the earning power of money, and to that extent is consistent with the models submitted by Dr. Berenson. By assuming this offset, Dr. Ralls' figures obviate further discounting. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 2557, 76 L.Ed.2d 768 (1983); *O'Rourke v. Eastern Airlines, Inc.*, 730 F.2d 842, 857 (2d Cir.1984).

Model III also reflects the impact of taxes and of plaintiff's future earnings capacity.

**5.** The right to contribution under the Federal Tort Claims Act, and the effect of a release or covenant not to sue, is governed by state law. *United States Lines, Inc. v. United States*, 470 F.2d 487, 490 (5th Cir.1972) (per curiam); *Mal-*

*tais v. United States*, 439 F.Supp. 540 (S.D.N.Y. 1977). New York's General Obligation Law § 15–108 states that "when a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, ... it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release ... or in the amount of the contribution paid for it, or in the amount of the released tortfeasor's equitable share of the damages ..., whichever is the greatest."

The government suggests that § 15–108 compels the Court to subtract the amount of Poling's settlement, $150,000, from the damage award attributable to defendant. It is doubtful that § 15–108 is applicable when the tortfeasors are successive and independent, since the respective tortfeasors are not liable for the *same* injury. Even if § 15–108 governs, however, no reduction in the amount of the damage award attributable to defendant (40%) is necessary, since by the Court's calculations, Poling's equitable share of the damages (60%) is greater than the $150,000 it paid for the release (which was also the amount stipulated by the release).