**Brigiatta K. AVAKIAN and Robert Avakian, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 85–CV–706.**

United States District Court, N.D. New York.

June 12, 1990.

Daniel H. Mahoney, Albany, N.Y., for plaintiffs.

Nikki Calvano, U.S. Dept. of Justice, Washington, D.C., for U.S.; Captain Thomas Ware, of counsel.

Martin Ganotis & Brown, Syracuse, N.Y., for Patel; Thomas F. Currie, of counsel.

Hesson Ford & Whalen, Albany, N.Y., for Sterling Drug; Daniel A. Whalen, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), ("F.T.C.A.") alleging that the United States ("the defendant" or "the government") failed to obtain plaintiff Brigiatta Avakian's ("Mrs. Avakian's") informed consent prior to the performance of a myelogram at the Plattsburgh Air Force Base Hospital in Plattsburgh, New York. Plaintiffs further allege that the defendant was negligent in the care and treatment it afforded Mrs. Avakian while an inpatient at the hospital. Mrs. Avakian's husband, Robert Avakian ("Mr. Avakian"), has also sued the defendant in a claim based upon loss of consortium. For the reasons stated below, this court finds for the defendant on all those counts of plaintiffs' complaint asserted against the government.[1]

### Findings of Fact

Brigiatta Avakian was born in Trier, West Germany, on May 31, 1951. As a child, the plaintiff suffered from a variety of childhood diseases, including measles, chicken pox, mumps and rubella fever. From time to time, the plaintiff also suffered back pain, which she helped alleviate by applying heat to the affected area. At the age of sixteen, she became an apprentice in an organization which designed and manufactured ladies clothing, and after approximately three year's training, received

---

1. The causes of action in plaintiffs' complaint alleging negligence, breach of warranty and strict liability on the part of Winthrop Laboratories, a division of Sterling Drugs, Inc., and Dr. Soham S. Patel were dismissed by orders of this court dated 12/8/89 and 12/15/89 respectively, and were therefore not considered by this court.

a diploma roughly equivalent to a two-year business associate's degree in this country.

In December of 1969, while still working at the garment store, Brigiatta met plaintiff Robert Avakian, a member of the United States Air Force. On August 4, 1972 Brigiatta and Robert were married in Wiesbaden, West Germany. Mrs. Avakian began working at a nearby bank after their marriage, and continued to work there until she had her first and only child, Nichole, on February 25, 1976. Soon after the birth of their daughter, Robert was transferred back to the United States and the plaintiffs moved to Columbus, Mississippi, where Mrs. Avakian worked as a part-time sales clerk.

In 1982, Mr. Avakian was transferred to the United States Air Force Base in Plattsburgh, New York. The plaintiffs and their daughter took up residence in base housing and Mrs. Avakian became employed as a part-time school lunch monitor while her daughter attended a nearby elementary school.

Towards the end of February of 1984, Mrs. Avakian, while bowling, felt a pain in her back and had difficulty standing up. She went home and applied heat to the affected area. Soon after this episode she once again experienced sharp pains in her back while shoveling snow. These pains were severe enough to convince Mrs. Avakian that professional help was required, and she accordingly went to the Plattsburgh Air Force Base Hospital ("PAFBH" or "base hospital").

Upon arriving at the PAFBH, Mrs. Avakian came in contact with Frederick C. Hunt ("Hunt"), a physician's assistant ("P.A.") at the base hospital.[2] A clinical examination of the plaintiff performed by Hunt demonstrated that she was suffering from neurological deficits, muscle weakness and a tingling sensation in her legs. After consulting with Dr. Donald Anderson ("Dr. Anderson"), a board certified family practitioner at the PAFBH, Hunt arranged for Mrs. Avakian's admission into the base hospital on March 2, 1984. The plaintiff was admitted into the PAFBH with a diagnosis of a herniated nucleus pulposus ("HNP"), i.e., a herniated disc.

P.A. Hunt and Dr. Anderson began a conservative treatment program for Mrs. Avakian which consisted of bed rest with heat. In order to lessen the pain she was experiencing, Anderson also prescribed the muscle relaxer Valium for the plaintiff.[3]

On the date of her admission, Mrs. Avakian underwent lumbar spine x-rays. Upon reviewing these x-rays and having determined that they were inconclusive, Dr. Anderson arranged to have plaintiff undergo a CT-scan on March 7, 1984. This examination, which was to be performed on the L4–L5 and L5–S1 areas of plaintiff's back, was ordered as a supplemental diagnostic aid.

As was his custom, Hunt met with all of his patients, including the plaintiff, at least two times a day as he followed their progress and determined whether the medications they were given were having the desired effect. On March 4, 1984, Hunt noted that Dr. Anderson had decreased the amount of Valium the patient was to be given after Dr. Anderson was informed by a nurse that the Valium had been making the plaintiff feel drowsy. On March 6th, Dr. Anderson, after determining that the patient was not responding as expected to the Valium, discontinued the use of this drug completely, and prescribed Robaxin, another muscle relaxer, for the patient.

On March 8th, the plaintiff developed a rash on her abdomen, chest, back and upper arms of unknown origin.[4] While trying

2. The plaintiff had seen Hunt prior to this 1984 visit. P.A. Hunt testified that when Mrs. Avakian came to the PAFBH complaining about pains in her back in 1982, she told him that she had had a history of back pain for a great deal of her life. *See* Trial testimony of February 5, 1990.

3. At this time, the plaintiff also began taking the anti-inflammatory drug Indocen.

4. The plaintiff attempted to prove that this rash, and other symptoms she experienced while an inpatient of the PAFBH (including a temporary memory loss on March 4th), was an allergic reaction to the Valium she was being administered. However, this contention was not proved

to determine the cause of this rash, Dr. Anderson and P.A. Hunt also examined the results of the CT-scan which had been performed on the plaintiff the previous day. Like the x-rays, the CT-scan was negative for a finding of a herniated disc. Dr. Anderson and P.A. Hunt next contacted Dr. Soham S. Patel ("Dr. Patel"), a consulting neurosurgeon to the PAFBH.[5]

On March 9, 1984, Dr. Patel performed a clinical examination on the plaintiff. After reviewing the results of this exam, as well as plaintiff's past history concerning her back problems, Dr. Patel recommended that Mrs. Avakian undergo the diagnostic procedure known as a myelogram. At this time, Dr. Patel briefly explained to the plaintiff the mechanics of the procedure: after anesthetizing the appropriate part of the plaintiff's back, a needle would be inserted into her spine and some of its fluid would be withdrawn. This fluid would be replaced by a dye, in this case Amipaque, a brand name of the contrast medium Metrizamide. Once this dye was in the plaintiff's spinal canal, x-rays of the spine would be taken and a herniated disc could be

more easily identified and if present, localized.

After discussing with Dr. Patel the results of his clinical examination and his recommended course of action concerning Mrs. Avakian, both Dr. Anderson and P.A. Hunt concurred in Dr. Patel's recommendation that the plaintiff undergo a myelogram on Monday, March 12, 1984.[6]

Dr. Alfred Bedford ("Dr. Bedford"), an Air Force radiologist, was the physician designated to perform the myelogram on Mrs. Avakian. Dr. Bedford testified that, as was his custom, he saw the plaintiff the night before the myelogram, and explained to her in detail the mechanics of the procedure. He told her about the common risks associated with the myelogram, and also about the less common hazards of the procedure, among them being transient paresis or even death. After asking Mrs. Avakian if she had any questions, the plaintiff responded that she wanted the hospital to go ahead with the preparations for the myelogram, but that she would not sign the consent form until the following day.[7]

On the morning of the myelogram, P.A. Hunt met with Mrs. Avakian, who seemed

to the satisfaction of this court. For example, the plaintiff developed the rash in question on March 8th, yet Valium had been discontinued for this patient on March 6th. As Dr. Gerald Wolf noted, if a patient were having an allergic reaction to a drug, she would have such a reaction while on the drug, and not after it was already being cleared out of her system. *See* trial transcript of February 7, 1990, "February 7th transcript", pp. 98–100. Additionally, the patient was re-administered Valium on March 11th, yet she never developed a second rash, or reported that she suffered from any other "allergic" reactions due to Valium on this or subsequent dates. Moreover the plaintiffs, in their second set of supplemental answers to the government's first set of interrogatories, stated that the only known chemical substance to which Mrs. Avakian was allergic was Bactrim— she did not claim to be allergic to Valium, at least through May of 1987. *See* plaintiffs' second supplemental answers to the government's first set of interrogatories, defendant's exhibit "U", no. 11. Thus, the court concludes that the plaintiff never suffered an allergic reaction to the Valium she was administered while at the PAFBH.

5. Dr. Patel did not maintain a contractual relationship with the PAFBH. He was a civilian

physician whom the doctors at the base hospital conferred with from time to time whenever a consultation with a specialist in neurosurgery was required.

6. In accordance with Dr. Patel's recommendation, the patient was re-administered Valium the day before her scheduled myelogram. Decadron, an anti-inflammatory agent, was also started for the plaintiff on March 11th at 6:00 p.m.

7. The parties vigorously disagree over whether Dr. Bedford ever saw the patient before the morning of the myelogram. Mrs. Avakian claims that Dr. Bedford never visited her the night before the myelogram, and that he never discussed the details of the procedure with her. Dr. Bedford alleges that he fully discussed with the plaintiff the details of the myelogram. He noted that since a patient's cooperation and participation during a myelogram is essential, it is very important that all potential patients are fully aware of what the procedure entails, and ask any and all questions they have before undergoing one. This court gives greater credance to the testimony of Dr. Bedford than that of Mrs. Avakian as it relates to what Dr. Bedford claims he discussed with the plaintiff the night before the myelogram.

to him to be alert, awake and apprehensive about the upcoming procedure. She explained to Hunt that she had a friend who had experienced back pain and numbness following a myelogram, and that she was concerned that she might suffer the same fate if she were to undergo one. Hunt reassured her, told her that he had witnessed numerous patients tolerate the procedure without incident and informed her that he would be in the room while the myelogram was being performed to give her moral support. A few hours later the plaintiff was transported on a gurney to the hall outside the room where the procedure was to take place. Prior to the procedure, the plaintiff was administered 5 mg. of Valium and 6 mg. of Decadron.

While in the hallway, Mr. Avakian reassured his wife, who appeared to him to be scared, that she should not be concerned about undergoing the myelogram. As he was talking with her, Dr. Bedford gave Mrs. Avakian the consent form and asked her to sign it. Her husband showed her where to sign the form, she signed it and was brought into the x-ray room.[8]

Once in the x-ray room, Dr. Bedford anesthetized the appropriate portion of Mrs. Avakian's back with Xylocane by way of a small needle approximately 1.5 cm. in length. Upon being assured by the plaintiff that the anesthesia had had its desired effect, Dr. Bedford slowly inserted the spinal needle, which would be used to both withdraw the spinal fluid and inject the Amipaque into her spinal column, between the L4 and L5 regions of Mrs. Avakian's back.[9]

At some point after the Amipaque was injected into the plaintiff's spine, Mrs. Avakian stated, in words or substance, that she wondered if her legs were in the air, because she could not feel them.[10] Dr. Bedford apparently ignored this statement, and continued on with the procedure. After the myelogram was completed, the plaintiff was assisted off of the operating table, onto a gurney, and taken out of the x-ray room. As she left, she told Dr. Bedford that he had done a good job, and that she couldn't feel a thing. Dr. Bedford jokingly retorted that that was why the PAFBH gave him big bonuses. Mrs. Avakian was then brought back to her room, where she was told to remain stationary for a period of eight hours. Later that evening, P.A. Hunt visited the plaintiff and discovered for the first time that she was having trouble feeling her legs. He then related this problem to Dr. Anderson.

Hunt saw the plaintiff the following day, March 13th, and afterwards noted in her progress notes that she was experiencing a weakness in both legs, a tingling sensation in both feet and was unable to stand or void. The plaintiff was then catheterized because she was unable to pass her urine.

On March 14th, after noting that the plaintiff continued to have pain in both legs and in her pelvic region, P.A. Hunt called to arrange for a consultation between him-

---

**8.** The consent form which the plaintiff signed had the handwritten word "Myelogram" clearly printed at the top of the page. This form also contained a section where the doctor is given the opportunity of explaining, in layman's terms, what the procedure entails. Dr. Bedford did not re-describe the procedure to the plaintiff on the consent form purportedly because he had already explained it to her in detail the previous evening.

**9.** Throughout the course of the myelogram, x-rays were taken of the plaintiff's spine. The x-rays are utilized to determine not only whether a patient is in fact suffering from a herniated disc, but also, according to Dr. Bedford, to ascertain whether the myelographic procedure is being performed properly.

**10.** At this point, the plaintiff experienced an idiosyncratic reaction to the Amipaque dye, which ultimately resulted in permanent partial paralysis of plaintiff's lower extremities. The parties disagree over whether the plaintiff ever said she could not feel her legs while the myelogram was being performed. Both P.A. Hunt and Nurse Miller claim that they never heard her make any comments to this effect, but they concede that the plaintiff was conversing with Dr. Bedford throughout the procedure in German. Dr. Bedford claims that he never heard her complain of an inability to feel her legs, while the plaintiff herself alleges that she did make the aforementioned statements. This court was more persuaded by the testimony of Mrs. Avakian in this respect, and accordingly finds that sometime after the introduction of the Amipaque into the plaintiff's spine, Mrs. Avakian stated that she could not feel her legs.

self and Dr. Patel in order to determine the appropriate course of treatment for the plaintiff. At this time, Hunt also found that Mrs. Avakian's symptoms seemed to be "waxing and waning": sometimes the plaintiff experienced no "pin-prick" sensations around her legs and feet, yet at other times she had them, during one test her reflexes proved normal while later they did not, her muscle strength was normal on one occasion but abnormal the next, and so on.

On March 15th, Hunt met with Dr. Patel to discuss the plaintiff's condition. Dr. Patel performed various clinical tests on Mrs. Avakian, which tests confirmed P.A. Hunt's beliefs that the plaintiff's neurological symptoms were confusing and at times contradictory, making a definite diagnosis of the plaintiff's condition difficult. However, since she was still experiencing partial paralysis of her lower extremities, Drs. Anderson and Patel, as well as P.A. Hunt, arranged to have the patient transferred to the Champlain Valley Physicians Hospital (CVPH), under the care of Dr. Patel, on March 16, 1984.

While an inpatient at the CVPH, the patient's condition improved slightly. Her progress notes the day before she was discharged on March 27, 1984, however, indicated that her paraparesis remained a persistent problem. As an outpatient of the CVPH, Mrs. Avakian no longer remained wheelchair dependent, and began ambulating with the use of a walker and later with the assistance of Canadian braces. The plaintiff was next referred to the Vermont Medical Center under the care of Drs. Ruess and Vinson, who established a rehabilitative program for her. They also treated Mrs. Avakian for problems she was experiencing with her bladder. She remained an outpatient of these institutions until June of 1985, when her husband was transferred to Sacramento, California.

Since March 12, 1984, the plaintiff has remained partially paralyzed.[11] She has also sustained a number of post-myelogram injuries due in large part to her paralysis.

In her most recent injury, which occurred on December 27, 1989, Mrs. Avakian suffered a "T"-type fracture of her right knee which, according to Dr. Stephen P. Nickish, may never heal properly because the plaintiff's bones have been softened due to inactivity, i.e., osteoporosis. Her paralysis has prevented her from securing full-time employment since the date of the myelogram.

Brigiatta separated from her husband Robert in May, 1987. He remained on active Air Force duty in California, and she and her daughter have since taken up residence with a family friend in the Plattsburgh, New York area. Her husband Robert has been sending her and their daughter $400.00 per month since their separation and the remainder of her income, which varies slightly from month to month, is supplied by a German health insurance policy currently held by the plaintiff.[12]

### Conclusions of law

Under the F.T.C.A., the liability of the United States for a negligent act or omission is governed by the law of the State where the alleged negligence occurred, in this case, New York. See 28 U.S.C. § 1346(b). Therefore, this court will apply New York law in determining whether the government (1) failed to obtain Mrs. Avakian's informed consent prior to the myelographic procedure and (2) was negligent with respect to the care and treatment it afforded the plaintiff while she was an inpatient at the PAFBH.

#### (1) The informed consent claim

The plaintiffs' amended complaint alleges that the government failed to obtain Mrs. Avakian's informed consent prior to performing the myelogram on March 12, 1984. Mrs. Avakian claims that she and Dr. Bedford never discussed any of the risks associated with the procedure, including the risk of paralysis, before she under-

---

11. This paralysis also prevents the plaintiff from experiencing any sexual pleasure, as she has little feeling from her waist down.

12. In December of 1989, for example, the plaintiff's monthly income from this policy was approximately $1,020.00.

went the myelogram, and that her signature on the consent form should be discounted because she was on Valium at the time she signed the form at issue.

■ To prevail on her informed consent cause of action, the plaintiff must prove that the defendant failed to disclose to her the material risks, benefits and alternatives to the procedure which would have been disclosed by a reasonable medical practitioner. *Hylick v. Halweil,* 112 A.D.2d 400, 401, 492 N.Y.S.2d 57, 59 (2d Dep't.1985). Additionally, the plaintiff must prove, by a preponderance of the evidence, that a reasonably prudent person in the patient's circumstances would have refused to undergo the treatment if reasonably informed of the significant perils, *Shinn v. St. James Mercy Hosp.,* 675 F.Supp. 94, *aff'd.* 847 F.2d 836 (2d Cir.1988); *Dooley v. Skodnek,* 138 A.D.2d 102, 106, 529 N.Y.S.2d 569, 571 (2d Dep't.1988) and that the lack of informed consent was the proximate cause of the injury or condition for which recovery is sought. *See generally* N.Y.Public Health Law § 2805–d.

■ Here, as this court has already noted, the credible evidence supports a finding that Dr. Bedford fully informed Mrs. Avakian about the alternatives to, and the risks and benefits associated with a myelogram when he visited her the day before the procedure was to be performed. Dr. Bedford warned Mrs. Avakian about the risk of paralysis on his visit of March 11th, even though the medical literature available to physicians at the time the plaintiff underwent the procedure revealed only two reported cases where a patient had suffered permanent paralysis following a myelogram.[13] Mrs. Avakian admittedly signed the consent form the morning of the procedure, which form had the word "Myelogram" clearly handwritten at the top of the page.[14] Dr. Gerald L. Wolf, ("Dr. Wolf"), one of the defendant's expert medical witnesses and also a pharmacologist,[15] stated that the Valium the plaintiff was administered prior to her signing the consent form in no way diminished her capacity to consent to the procedure.[16] Since the court finds that Mrs. Avakian was fully informed of the risks associated with the myelogram at the time she signed the consent form, the plaintiff has failed to establish the first element of her informed consent claim.

■ Even if this court were to believe the testimony of Mrs. Avakian that Dr. Bedford never discussed with her the risks associated with the procedure, the plaintiff was still required to prove, *inter alia,* that a reasonably prudent person in the plaintiff's position would not have undergone the treatment if she had been fully informed. *See* N.Y.Public Health Law § 2805–d(3). Such a determination necessarily requires that the fact-finder balance the risks associated with having the procedure performed against the risks associated with forgoing it. *Shinn,* 675 F.Supp. at 99; *Hylick,* 112 A.D.2d at 402, 492 N.Y.S.2d at 59.

The risks the defendant had a duty to disclose that were associated with a myelogram in March of 1984 included headaches,

---

**13.** *See* defendant's exhibit "T–1". Dr. David O. Davis testified that an exhaustive search of the available medical literature disclosed that only two cases were reported through March 12, 1984 where a Metrizamide myelogram apparently caused irreversible neurological complications, even though by that time nearly 2,500,000 myelograms had been performed in this country, most of which used Metrizamide as a contrast agent. *See* February 7th transcript, pp. 19–22.

**14.** *See* plaintiffs' exhibit "1–A".

**15.** Dr. Wolf impressed this court as a physician well qualified in his areas of expertise. Since graduating *cum laude* from Harvard medical school, Dr. Wolf has taught at several medical schools and has won numerous honors and awards for his work. Additionally, Dr. Wolf has authored over one hundred original articles in various medical publications, and it was uncontroverted at trial that he is an expert in the field of contrast media.

**16.** February 7th transcript, pp. 116–117. Dr. Arthur Wendth, Jr., one of the plaintiffs' expert witnesses, admitted that it was beyond his field of expertise to say whether Mrs. Avakian's consent would be suspect given the amount of Valium the plaintiff was receiving at the time she signed this form. *See* trial transcript of January 31st, 1990, "January 31st transcript", pp. 140–141.

nausea, seizures and perhaps temporary disorientation.[17] The plaintiff had suffered from persistent pains in her back throughout most of her life. She sought medical attention at the PAFBH in an attempt to alleviate problems she was experiencing with her back. She was admitted to the base hospital with a diagnosis of a HNP. X-rays taken of her lower back were negative, and a CT-scan of the lumbar region of the plaintiff's spine also proved inconclusive. The only remaining diagnostic procedure generally available to physicians in March of 1984 was the myelogram, and, after consulting with an independent neurosurgeon, Dr. · Anderson recommended that the plaintiff undergo this procedure using the then state-of-the-art contrast medium Amipaque. A myelogram may have conclusively proved that the plaintiff was suffering from a HNP. Had the disc been properly treated, the plaintiff's persistent back problems could have been alleviated. At trial, the plaintiff failed to introduce any evidence which would enable this court to conclude that a reasonable person in plaintiff's circumstances would have refused the procedure if she had been fully informed of the risks associated with the myelogram; therefore the plaintiff has failed to prove this element of her informed consent claim as well.

In sum, the court finds that the plaintiff was fully informed about the various alternatives and the reasonably foreseeable risks and benefits associated with the myelographic procedure prior to her operation on March 12, 1984. Additionally, even had she not been so informed, she failed to introduce any evidence that a reasonable person in the plaintiff's circumstances would not have undergone the procedure had she been fully informed. Since she has failed to prove two of the elements required in her claim based upon the government's alleged failure to obtain her informed consent concerning the myelogram, this court finds for the defendant on plaintiff's fourth cause of action.

(2) The negligence claim

The plaintiffs offer numerous theories of liability in support of their claim that the government was negligent with respect to the care and treatment it provided Brigiatta Avakian during her stay at the PAFBH. They allege that a myelogram was not indicated for the patient, and that the defendant should have ordered alternative diagnostic procedures for her. Secondly, they claim that the plaintiff's alleged allergic reaction to Valium indicated that she would have a heightened sensitivity to Metrizamide, and that the defendant did not utilize available tests which would have shown that an Amipaque myelogram was contraindicated for this patient. The plaintiffs further claim that the positioning of the spinal needle during the procedure was improper since the plaintiff was diagnosed as having a HNP in the L4–L5 region of her back, and that the insertion of this needle at this location may have caused Mrs. Avakian's paralysis. Plaintiffs' fourth theory of negligence alleges that the procedure should have been aborted once Mrs. Avakian stated that she could not feel her legs, and that Dr. Bedford should have immediately withdrawn the Metrizamide from plaintiff's spine and given her massive doses of Decadron in order to reverse the adverse affects of the Metrizamide. Plaintiffs' final theory of negligence claims that Dr. Bedford was negligent in the follow-up care he provided Mrs. Avakian.

■ Under New York law, a doctor is liable for malpractice if he violates ordinary and accepted standards or fails to exercise the skill of the average member of the medical community. *See Mann et al. v. United States*, 904 F.2d 1, 2 (2d Cir. 1990). Accordingly, the issue in every action alleging malpractice is whether the plaintiff has established that what the doctor did, or failed to do, in his treatment of the patient constituted a departure from this standard of care. *Wilson v. United States*, 613 F.Supp. 1322, 1326 (E.D.N.Y. 1985), *Spitzer v. Ciprut*, 80 A.D.2d 891, 437 N.Y.S.2d 27, 28 (2d Dep't.1981). A doctor is not liable merely because an operation does not yield a good result. *Pike v.*

17. *See* February 7th transcript, pp. 17–18.

*Honsinger*, 155 N.Y. 201, 210, 49 N.E. 760 (Ct.App.1898), *Wilson*, 613 F.Supp. at 1326.

With the elements of a medical malpractice action firmly in hand, this court proceeds to analyze each of the plaintiffs' theories alleging negligent conduct on the part of the defendant.

*(a) The ordering of the myelogram.*

■ It was within the required standard of care for Dr. Anderson to order a myelogram for Mrs. Avakian. The x-rays and CT-scan taken of plaintiff's spine had proven inconclusive, and a myelogram was the only remaining diagnostic procedure available for persons suspected of having a HNP in early 1984.

Dr. Paul DeLuca ("Dr. DeLuca"), one of the plaintiffs' expert witnesses, testified that he believed that Magnetic Resonance Imaging ("MRI") tests were available diagnostic tools at the time, although he conceded that they may not have been available in the Plattsburgh community in March of 1984.[18] Dr. David O. Davis ("Dr. Davis"), an expert witness for the government, testified that at the time in question MRI's had very low image qualities, and therefore it was not standard practice in the medical community to offer MRI's to patients as an alternative to a myelogram.[19] Dr. Wolf, another of the defendant's expert witnesses, similarly testified that MRI's were not functional in clinical facilities until the end of 1984.[20] In fact, the plaintiffs admitted, in their response to the government's request for admissions, that the performance of a lumbar myelogram to diagnose a possible HNP comported with the standard of care in 1984.[21] Thus, the government was not negligent in ordering a myelogram for the plaintiff at the time in question.[22]

*(b) The appropriateness of performing a myelogram which contained the compound Metrizamide.*

■ The plaintiffs next contend that a myelogram containing the contrast medium Metrizamide was inappropriate for this patient in light of her alleged allergic reaction to Valium. They also claim that the government failed to adequately test Mrs. Avakian for a potential allergic reaction to Metrizamide.

As discussed *supra* at n. 4, the plaintiff never suffered from an allergic reaction to Valium. Additionally, the use of Valium immediately prior to the performance of a lumbar myelogram was within the required standard of care in 1984. Dr. Wolf's uncontroverted testimony revealed that (i) Valium is commonly used as a muscle relaxer in conjunction with a myelogram, (ii) the amount of Valium the plaintiff received on March 11th and 12th was similar to doses other physicians administer when using this drug as a muscle relaxer and (iii) the use of Valium with respect to Mrs. Avakian did not deviate from accepted standards of medical practice.[23] Dr. DeLuca speculated at trial that the defendant should have suspected that the plaintiff had a heightened sensitivity to Metrizamide, yet he based this theory on his erroneous assumption that Mrs. Avakian was allergic to Valium.[24] Since the plaintiff never experienced an allergic reaction to this drug, and the use of Valium with respect to this patient was appropriate, there was no reason for the government to suspect that Mrs. Avakian would have had a heightened sensitivity to Metrizamide.

---

**18.** January 31st transcript, p. 48.

**19.** February 7th transcript, pp. 31–32.

**20.** *Id.*, p. 87.

**21.** *See* plaintiffs' answers to the government's requests for admissions, defendant's exhibit "V", no. 124.

**22.** Dr. DeLuca testified that it would have been proper procedure for the patient to undergo a laminectomy, or surgery, without any further diagnostic procedures. *See* January 31st transcript, p. 48. However, nowhere in his testimony does Dr. DeLuca state that the ordering of a myelogram as a diagnostic aid was negligence *per se* on the part of the government.

**23.** February 7th transcript, pp. 95–100.

**24.** January 31st transcript, pp. 46–47.

Plaintiff further contends that the defendant was negligent by failing to administer pre-lumbar myelogram tests which would have indicated that Mrs. Avakian was allergic to the contrast medium Metrizamide. The court finds that, contrary to the assertions of Dr. DeLuca, no such tests were available.

Dr. DeLuca testified that two medical techniques existed in March of 1984 wherein a patient could be tested for potential allergic reactions to Metrizamide. These methods purportedly involved either the injection of Metrizamide into the external eyelid of the patient or an intradermal injection of the contrast medium.[25] Dr. Davis noted that these tests were once utilized in the 1960's, but that they proved to be not only unreliable indicators of sensitivity to Metrizamide, but also potentially hazardous to the patient.[26] He testified that both of these tests were "totally refuted and discarded" by the medical community approximately twenty-five (25) years ago.[27] Dr. Kevin D. Barron, ("Dr. Barron"), one of the defendant's expert witnesses, reiterated these views when he testified that there was no correlation between how a person would react when Metrizamide was injected into either their eyelid or under their skin and the effect the compound would have on that person's central nervous system.[28] In fact, even Dr. DeLuca, the plaintiff's expert, conceded that the failure of the defendant to administer either of these tests was not a deviation from the accepted standards of medical care.[29] Therefore, it is clear that the government was not negligent by failing to test Mrs. Avakian for sensitivities to Metrizamide prior to the performance of the myelogram.

### (c) The placement of the anesthetizing and spinal needles.

█ The needle used to anesthetize the area surrounding the lumbar portion of the plaintiff's back did not damage Mrs. Avakian's spine nor cause her subsequent paralysis. As discussed earlier, this needle was approximately 1.5 cm. in length, and therefore, as Dr. Davis' testimony indicated, not long enough to reach the subarachnoid space of plaintiff's spine.[30]

Dr. DeLuca testified that the insertion of the spinal needle between the L4–L5 region of plaintiff's lower back was not standard and accepted practice when a person is diagnosed as having a HNP in this same location.[31] He claimed that this placement would be incorrect because the spinal needle might distort the dural sac and thereby give a physician the false impression that a herniated disc is present when in fact one is not.[32] Dr. Davis conceded that the placement of the needle in this area may be something to avoid, but only because a hematoma might develop as a result, making a definite diagnosis of a HNP more difficult.[33] However, he emphasized that a misplaced needle under these circumstances would not damage a patient in any way,[34] and that the insertion of the spinal needle during the plaintiff's myelogram in particular was in compliance with the required standard of care of a reasonable practicing radiologist.[35] Dr. Davis continued by stating that the placement of the spinal needle could not have caused Mrs. Avakian's subsequent neurological deficits, because the plaintiff experienced problems

25. *Id.*, p. 104.

26. *February 7th transcript, pp. 32–33.*

27. *Id.*, p. 33.

28. *See* trial testimony of February 16th, 1990 ("February 16th testimony"). Dr. Wolf similarly testified that neither of these tests were able to successfully predict a patient's subsequent adverse reaction to Metrizamide, and that it was not a deviation from the standard of care to not administer these tests. February 7th transcript, pp. 110–111.

29. January 31st transcript, pp. 104–105.

30. February 7th transcript, pp. 54–55.

31. January 31st transcript, pp. 55–56.

32. *Id.*, p. 56.

33. February 7th transcript, p. 36.

34. *Id.*

35. *Id.*, p. 57.

in a number of areas throughout her body, and not just in the area where this needle entered her spine.[36] This sentiment was reiterated by Dr. Wolf, who testified, in substance, that the placement of the spinal needle during the plaintiff's myelogram was so far removed from the spinal cord so as to preclude damage to it.[37] The plaintiffs, in their amended answers to the government's request for interrogatories, admitted that they have no laboratory data which demonstrated that Mrs. Avakian's neurological problems were caused by the positioning of the infiltration needle between the L4–L5 region of plaintiff's spine.[38] In fact, even Dr. DeLuca ultimately concluded that the cause of plaintiff's injury was unrelated to the placement of the spinal needle, and was fundamentally due to the Metrizamide that was injected into plaintiff's spine.[39] Accordingly, this court finds that the defendant was not negligent in the placement of either the anesthetic or spinal needles with respect to the myelogram performed on Mrs. Avakian on March 12, 1984.

*(d) The performance of the myelogram.*

■ Once the needle had been inserted into the L4–L5 region of plaintiff's back, Dr. Bedford withdrew a small amount of the patient's spinal fluid and then, through the same needle, introduced the Amipaque dye into the plaintiff's spine.[40] Sometime after this material was introduced into her lower back, the plaintiff asked Dr. Bedford if her legs were in the air because she could no longer feel them. Dr. Bedford, apparently unperturbed by this comment, continued the procedure and took various x-rays, or films, of the plaintiff's spine while the dye was still present. He then completed the myelogram, and wrote in her progress notes that the plaintiff tolerated the procedure well.

The plaintiffs allege that the defendant was negligent because it did not abort the procedure once Mrs. Avakian complained of a numbness in her legs, and because it failed to (i) withdraw the Amipaque from the plaintiff's spine and (ii) immediately administer massive doses of Decadron to the plaintiff in an effort to counteract the adverse effect the Amipaque was having on plaintiff's body.

With respect to their first contention, Drs. Davis, Wolf and Barron all testified that they would not have stopped the procedure even had the plaintiff stated that she could not feel her legs while the myelogram was being performed.[41] Dr. Davis stated that he would not pay any attention to this complaint,[42] and both he and Dr. Wolf testified that they would continue to take pictures of the plaintiff's spine despite this comment.[43] Drs. DeLuca and Wendth claimed that the proper procedure under these circumstances would have been to abort the procedure.[44] Dr. Patel, the consulting neurosurgeon, also stated that the proper procedure would have been to abort the procedure at this time.[45] After weighing the conflicting evidence before it con-

**36.** *Id.,* pp. 57–58.

**37.** *Id.,* p. 123. Dr. Barron concurred in the opinions of Drs. Davis and Wolf and concluded that the placement of the spinal needle at the L4–L5 region of plaintiff's spine did not cause her paralysis. *See* February 16th testimony. Dr. Barron, through the use of various diagrams of the human body (received into evidence as defendant's exhibit "AE–1") proved to the satisfaction of this court that the placement of this needle could not have caused the plaintiff's paralysis.

**38.** *See* plaintiffs' amended answer to the government's request for admissions, defendant's exhibit "V", no. 60.

**39.** January 31st transcript, p. 60.

**40.** The plaintiffs' admitted, in their amended response to the defendant's request for admis-

sions, that the Amipaque used by the government for the myelogram in question was mixed in accordance with the specifications set forth by Amipaque's manufacturer, Winthrop Laboratories. *See* plaintiffs' amended answer to the government's request for admissions, defendant's exhibit "V", no. 50.

**41.** *See* February 7th transcript, pp. 80–81, 121–123; February 16th testimony.

**42.** February 7th transcript, p. 80.

**43.** *Id.,* pp. 80, 123.

**44.** January 31st transcript, pp. 38, 144–145.

**45.** *See* Trial testimony of February 1, 1990.

cerning this issue, this court was more persuaded by the testimony of Drs. DeLuca, Wendth and Patel in this regard, and finds that the Dr. Bedford should have aborted the myelogram once the plaintiff informed him that she could not feel her legs.

■ However, the failure to abort the myelographic procedure was not the cause of the plaintiff's injury. The plaintiff suffered from an idiosyncratic reaction to the Amipaque dye, which reaction this court has already found could not have been anticipated by the government prior to the performance of the myelogram. Nevertheless, the defendant would be liable for the plaintiff's injuries if it failed to institute known and proper remedial measures at the time Mrs. Avakian commented on the lack of feeling in her legs. The plaintiffs claim that two such remedial measures should have been undertaken by the defendant: the withdrawal of the Amipaque dye from plaintiff's spine and the administration of massive doses of Decadron to Mrs. Avakian.

(i) The withdrawal of the Amipaque dye from plaintiff's spine

■ Dr. DeLuca testified that the plaintiff's attending physician should have withdrawn as much of the contrast medium as possible once the plaintiff complained of an inability to feel her legs.[46] However, Dr. DeLuca stopped short of stating that the withdrawal of this fluid was the required standard of care under the circumstances, rather he justified this procedure by arguing that anything that could have been done to ameliorate Mrs. Avakian's condition would have been a worthwhile and reasonable medical procedure.[47]

Since Metrizamide is water-soluble, Dr. DeLuca admitted that one would have to withdraw all of Mrs. Avakian's spinal fluid to remove all of the Amipaque dye.[48] However, Dr. Barron testified that the complete removal of the Metrizamide would be difficult because it rapidly penetrates a variety of spaces once inside the spine.[49] In fact, Dr. Wendth, one of the plaintiffs' experts, admitted that once a contrast agent is in a person's spine, it immediately starts to mix with the patient's cerebral spinal fluid, and therefore it would be "impossible to get all of it out...."[50] Since an individual's allergic response to a drug is not dose related,[51] even had Dr. Bedford withdrawn as much of the fluid as was possible at the time, some Metrizamide would have remained in the plaintiff's spine, and the amount remaining would still have caused her paralysis.

Moreover, the testimony this court heard at trial indicated that the withdrawal of Mrs. Avakian's spinal fluid may have actually been a dangerous procedure to undertake. Dr. Wolf stated that there was no way a physician could have safely reduced the amount of Metrizamide in the plaintiff's spinal column.[52] He testified that in order to withdraw the Amipaque, "one would have had to aspirate huge amounts of spinal fluid and then re-inject some artificial spinal fluids over and over and over again,"[53] and that he was not aware of any case where this treatment had ever been successfully implemented.[54] An examination of all the evidence before it concerning this proposed remedial measure convinced this court that the plaintiff did not prove that the failure of Dr. Bedford to withdraw both the Amipaque dye and Mrs. Avakian's spinal fluid from plaintiff's back deviated,

46. January 31st transcript, pp. 38–39, 41.

47. *See* February 16th testimony. Dr. Wendth testified that the withdrawal of Mrs. Avakian's spinal fluid after the Amipaque was introduced into her spine "might [have been] worth a try". January 31st transcript, p. 146.

48. *See* February 16th testimony.

49. *Id.*

50. January 31st transcript, p. 146.

51. February 7th transcript, p. 105.

52. *Id.*

53. *Id.,* pp. 104–106.

54. *Id.,* p. 105.

in any way, from the standard of care the defendant owed the plaintiff.[55]

### (ii) The administration of massive doses of Decadron

■ The plaintiff also failed to demonstrate that the defendant breached its duty of care by failing to administer massive doses of Decadron to Mrs. Avakian. Dr. DeLuca stated that the patient should have been given "very large and frequent" doses of Decadron, an anti-inflammatory agent, once the plaintiff complained of a numbness in her legs.[56] He claimed that the use of this drug, in doses of approximately 100 mgs. every four hours, "would have significantly contributed to alleviating and minimizing and lessening the devastating effect of this Metrizamide."[57] However, as with his testimony concerning the aspiration of the plaintiff's spinal column, Dr. DeLuca never stated that it was standard and accepted medical practice to administer the doses of Decadron he claimed were appropriate.

Decadron is sometimes given to patients as a way of preventing potential allergic reactions to certain drugs or compounds.[58] Dr. Wolf testified that the plaintiff had already been given an "heroic dose" of Decadron when Dr. Anderson ordered that the patient be administered 6 mg. of the drug prior to the myelographic procedure.[59] He further stated that the dosage Dr. DeLuca recommended Mrs. Avakian be administered following her complaint concerning a numbness in her legs would be inappropriate because the patient had already been adequately protected by the Decadron she was receiving, and because there is no evidence in the medical literature that massive doses of Decadron have any benefit whatsoever under these circumstances.[60] Dr. Barron echoed Dr. Wolf's sentiments concerning the lack of medical studies supporting Dr. DeLuca's proposed remedial plan concerning the use of Decadron, and noted that a number of dangers are associated with administering such high doses of Decadron, including possible damage to the patient's immune system.[61]

As with the testimony concerning the appropriateness of aspirating the plaintiff's spine, this court was more persuaded by the defendant's expert witnesses as it related to the effect the administration of large doses of Decadron would have had on Mrs. Avakian, and therefore holds that the government was not negligent when it failed to give the plaintiff massive doses of Decadron after Mrs. Avakian complained of a lack of feeling in her legs.

Thus, even had the government aborted the procedure at the time the plaintiff stated that she could not feel her legs, it would have been too late to change the tragic outcome in this case—the plaintiff had already experienced an idiosyncratic reaction to the Amipaque dye, and the defendant could not have done anything after the Metrizamide had been introduced into Mrs. Avakian's spinal canal which would have prevented plaintiff's subsequent paralysis.

---

**55.** In attempting to convince this court that the plaintiff's spinal fluid could have been safely removed from her spinal cord, Dr. DeLuca noted that prior to the use of contrast dyes, air was instilled into a person's spine during a myelogram after all of the patient's spinal fluid had been withdrawn. *See* February 16th testimony. However, he admitted that this technique had not been utilized since the early 1970's, and once again failed to state that the government was required to aspirate Mrs. Avakian's spine in order to comply with the accepted standards of medical practice.

**56.** January 31st transcript, p. 41.

**57.** *Id.,* p. 45.

**58.** February 7th transcript, p. 103.

**59.** *Id.,* p. 101. He noted that the usual dose administered to persons under similar circumstances would be approximately one-sixth of the amount given the plaintiff. *Id.*

**60.** *Id.,* pp. 102–104.

**61.** *See* February 16th testimony. The plaintiff never provided this court with any reports, surveys or other medical studies which concluded that Decadron would have been beneficial under the circumstances. In fact, Dr. DeLuca conceded that he was not aware of any article in the medical literature of a study wherein it was concluded that massive doses of Decadron, administered to a person suffering from an idiosyncratic neurological complication due to Metrizamide, ever reversed or ameliorated the signs and symptoms he or she was experiencing. *See* February 16th testimony.

*(e) The follow-up care provided by personnel at the PAFBH.*

■ The final theory by which the plaintiffs allege that the defendant was negligent in the treatment it provided Mrs. Avakian relates to the care she received post-myelogram.

Dr. DeLuca testified that Dr. Bedford should have consulted with the patient and/or Dr. Anderson, subsequent to the performance of the myelogram, to determine whether the patient had suffered any untoward problems as a result of the procedure. Dr. DeLuca further claimed that Dr. Bedford was required to notify anybody who had contact with the plaintiff, (relative to the problems she experienced concerning her back,) once the plaintiff experienced a numbness in her legs. Specifically, Dr. DeLuca testified that Dr. Bedford should have contacted Dr. Anderson, and in particular Dr. Patel, so that Dr. Bedford could receive the expert help and advice necessary to enable him to implement remedial measures concerning Mrs. Avakian's condition.[62] However, the treatment plans Dr. DeLuca claims Dr. Bedford should have initiated were procedures relating to the aspiration of plaintiff's spine and the administration of massive doses of Decadron.[63] This court has already concluded that these same procedures would not have been beneficial to the plaintiff, and in fact may have harmed Mrs. Avakian. Thus, the failure of Dr. Bedford to consult with Drs. Anderson and Patel after the plaintiff suffered an idiosyncratic reaction to the Amipaque dye in no way caused or compounded plaintiff's injuries.

Moreover, there was testimony at trial which indicated that it was not standard and accepted medical practice for Dr. Bedford to contact these physicians. Dr. Davis unequivocally stated that Dr. Bedford did not breach any standard of care when he failed to follow the patient's progress post-myelogram.[64] He maintained that it is not customary for radiologists to follow-up on their patients because the patients are no longer under their care, and that it is the responsibility of the physician who admitted the patient to follow a patient's improvement after a myelogram.[65] Additionally, Dr. Barron testified that Mrs. Avakian suffered no further damage as time passed after the completion of the myelogram, and that therefore even had Dr. Patel met with the plaintiff the evening of March 12th, the ultimate outcome in this case would have remained the same.[66]

The proof introduced at this trial compels this court to conclude that Mrs. Avakian experienced an idiosyncratic reaction to the Amipaque dye once it was introduced into her spine, and that, tragically, there was nothing either Dr. Patel or the personnel at the PAFBH could have done after its introduction which would have ameliorated or improved her condition. Accordingly, the court cannot find the defendant negligent in the care it provided Mrs. Avakian following the performance of the myelogram on March 12, 1984.

### (3) The loss of consortium claim

Plaintiffs fifth cause of action, brought by Robert Avakian under the F.T.C.A., asserts a claim against the government alleging loss of consortium. This claim is based solely on the defendant's alleged negligent care and treatment of Mrs. Avakian.[67]

In *Maddox v. City of New York,* 108 A.D.2d 42, 487 N.Y.S.2d 354 (2d Dep't. 1985), *aff'd.* 66 N.Y.2d 270, 496 N.Y.S.2d 726, 487 N.E.2d 553 (Ct.App.1985), the Appellate Division noted that "any cross-claim or derivative claim for loss of consortium must fall once the primary claim of negligence fails." *Id.* at 49, 487 N.Y.S.2d at 359 (citations omitted). *See also Gastwirth v. Rosenberg,* 117 A.D.2d 706, 499 N.Y.S.2d 95 (2d Dep't.1986), *appeal denied* 68 N.Y.2d 602, 505 N.Y.S.2d 1027, 496 N.E.2d 240 (Ct.App.1986); *Wittrock v. Maimon-*

---

62. *See* January 31st transcript, pp. 39–40.

63. *See id.,* pp. 40–45.

64. February 7th transcript, p. 56.

65. *Id.,* pp. 56–57.

66. *See* February 16th testimony.

67. *See* plaintiffs' amended complaint, ¶¶ 41–43.

*ides Medical Center–Maimonides Hosp.,* 119 A.D.2d 748, 501 N.Y.S.2d 684 (2d Dep't. 1986), *appeal denied* 68 N.Y.2d 607, 506 N.Y.S.2d 1032, 498 N.E.2d 434 (Ct.App. 1986).

In the instant case, this court has found that the defendant was not negligent in the care it provided Mrs. Avakian, and accordingly plaintiffs' fifth cause of action must fall.

### Conclusion

The government obtained Mrs. Avakian's informed consent prior to the myelographic procedure. Even had the defendant failed to do so, the plaintiff offered no evidence at trial demonstrating that a reasonable person in plaintiff's situation would not have undergone the procedure had he or she been fully informed about the possible risks and benefits associated with it. Therefore, the plaintiffs' claim based upon the government's alleged failure to obtain Mrs. Avakian's informed consent must fall. Additionally, the plaintiffs failed to prove, by a preponderance of the evidence, that the actions taken by the government and its employees at the PAFBH concerning the care and treatment afforded Mrs. Avakian during her stay at the base hospital did not comport with the standards of medical care required of an average member of the medical community in March of 1984. Thus, their causes of action alleging negligent conduct on the part of the government must also fail. Finally, Mr. Avakian's claim, based upon loss of consortium, must fall because the primary claim of negligence asserted against the government failed.

IT IS SO ORDERED.